S:\FILES\5821_FAIRCHEM MUSTANG\LEGAL+DISCOVERY\5821_PETITION_FINAL.DOC

KENNEDY LILLIS SCHMIDT & ENGLISH
John T. Lillis, Jr., Esq.
Nathan T. Williams, Esq.
75 Maiden Lane – Suite 402
New York, N.Y. 10038-4816
Telephone:  212-430-0800
Telecopier:  212-430-0810
Attorneys for Petitioner
LUKOIL PAN AMERICAS, LLC

RECEIVED
APR 22 2014
U.S.D.C. S.D.N.Y.
CASHIERS

14 CV 2860

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUKOIL PAN AMERICAS, LLC, <br><br> Petitioner, <br><br> - v. - <br><br> EURUS MARITIME S.A., PANAMA; FAIRFIELD CHEMICAL CARRIERS, INC.; ALLIED CHEMICAL CARRIERS, LLC; *in persona*, and the M/T FAIRCHEM MUSTANG, her engines, tackle, apparel, etc., *in rem*, <br><br> Respondents. | 14 Civ.    (    ) <br><br> PETITION TO <br> COMPEL ARBITRATION |

Petitioner, Lukoil Pan Americas LLC ("Lukoil"), by its attorneys, Kennedy Lillis Schmidt & English, allege upon information and belief as follows:

1.     This Honorable Court has subject-matter jurisdiction of this matter in that it involves maritime contracts of carriage and is within the meaning of 28 U.S.C. §1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

2.     This matter also involves the Federal Arbitration Act ("FAA"), 9 U.S.C. Chapter 1.

## THE PARTIES

3.     Lukoil is the shipper, consignee, and owner of a cargo of 134,997.67 barrels Ultra-Low Sulphur Diesel ("Cargo") shipped aboard the M/T FAIRCHEM MUSTANG from St. Rose, New Orleans, Louisiana, USA on or about 4 February 2013 and brings this action on its own behalf and on behalf of its insurers and other successors as their interests may ultimately appear.

4.     Lukoil is a Delaware limited liability company, with an office for the transaction of business at 1095 Avenue of the Americas, 33rd Floor, New York, NY 10036.

5.     Respondent, Eurus Maritime S.A., Panama ("Eurus"), is a Panamanian Sociedad Anónima, with an office for the transaction of business at No. 20 OF 51st Street & Federico Ave., P.O. Box 4493 Panama, Republic of Panama.

6.     At all relevant times, Eurus was the Owner or Disponent Owner of the M/T FAIRCHEM MUSTANG and a carrier of the Cargo.

7.     Respondent, Fairfield Chemical Carriers, Inc. ("Fairfield"), is a corporation organized and existing under, and by virtue of, the laws of one of states of the United States, with an office for the transaction of business at 21 River Road, 2nd Floor, Wilton, CT 06897.

8.     At all relevant times, Fairfield was the operator of the M/T FAIRCHEM MUSTANG and a carrier of the Cargo.

9.     Respondent, Allied Chemical Carriers LLC ("Allied"), is a limited liability company existing under, and by virtue of, the laws of one of states of the United States, with an office for the transaction of business at 21 River Road, 2nd Floor, Wilton, CT 06897.

10.    At all relevant times, Allied was the lead charterer of the M/T FAIRCHEM MUSTANG and a carrier of the Cargo.

11.    Respondent, M/T FAIRCHEM MUSTANG (the "Vessel"), was the ocean carrying vessel of the Cargo as set forth in, and pursuant to, contracts of carriage as described below.

## THE SHIPMENT

12.    On or about 17 January 2013, Lukoil, Eurus, and Fairfield entered a EXXONMOBILVOY 2000 Charter Party as modified by a 17 January 2013 Vessel Recap Email (collectively "Charter Party").  See EXXONMOBILVOY 2000, Exhibit 1, and 17 January 2013 Fixture Recap Email, Exhibit 2.

13.    In the Charter Party, the Parties agreed that the U.S. Carriage of Goods By Sea Act, 46 U.S.C. § 30701 ("COGSA"), would govern their respective rights and responsibilities.

14.    Under the Charter Party, Eurus and Fairfield agreed to transport the Cargo from New Orleans area to Buenaventura, Colombia or Balboa, Panama.

15.    On or about 4 February 2013, the Cargo, then in good order and condition, was loaded aboard the Vessel at St. Rose, New Orleans, Louisiana, USA.

16.     Allied issued Bills of Lading Nos. 1 and 2 to cover the subject shipment of the Cargo.  See Bills of Lading Nos. 1 and 2, Exhibit 3.

17.     By virtue of the issuance of Bills of Lading Nos. 1 and 2, Allied became a carrier of the Cargo.

18.     Further, by virtue of listing itself as a party to the Charter Party on Bills of Lading Nos. 1 and 2, Allied became a party to the Charter Party.

19.     Allied's status as carrier and party to the Charter Party is confirmed by the fact that it invoiced Lukoil for freight charges for the subject shipment and for demurrage on 15 March 2013.  See Demurrage Invoice, Exhibit 4.

20.     Thereafter, the Vessel sailed for the Port of Buenaventura, Colombia.

21.     The Vessel arrived at the Port of Buenaventura, Colombia on or about 12 February 2013.

22.     On or about 12-16 February 2013, independent cargo surveyors sampled the Cargo aboard the Vessel at the Port of Buenaventura, Colombia.

23.     When those samples were tested, they were found to be contaminated.

24.     Respondents caused the bad order and condition of the Cargo in violation of their duties as carriers of cargo by ocean transportation, including violations of the United States Carriage of Goods By Sea Act, 46 U.S.C. § 30701 ("COGSA"), and in breach of the Charter Party, Exhibits 1-2.

4

25.     Thereafter, on or about 19 February 2013, the customer of Lukoil, Ecopetrol SA, refused to accept delivery of the Cargo as being off-specification and in bad order and condition.

26.     Thereafter, on or about 21 February 2013, Lukoil arranged for the Vessel to depart Buenaventura, Colombia and proceed to Balboa, Panama for delivery of the Cargo to two receivers, Glencore and Trafigura.

27.     Between 26 February-13 March 2013, the Vessel discharged the Cargo at various terminals in Balboa, Panama for the receivers Glencore and Trafigura.

28.     Lukoil has sustained monetary damages in the estimated amount of $2.0 Million, no part of which has been paid by respondents.

## FIRST CAUSE OF ACTION

29.     Lukoil repeats and realleges the allegations in Paragraphs 1 through 28 as if fully set forth herein.

30.     In the Charter Party, the Parties agreed that any dispute would be referred to arbitration as follows:

> Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York, pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by Owner, one by Charterer and one by the two so chosen.

EXXONMOBILVOY 2000, Exhibit 2, Clause 35.

31.     The Charter Party is within the meaning of a "maritime transaction," as set forth in 9 U.S.C. § 1.

32.   As such, the arbitration clause contained in the Charter Party is valid under 9 U.S.C. § 2:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

WHEREFORE, Lukoil requests an Order from this Honorable Court directing the Respondents to arbitrate in New York.

Dated:  New York, New York
        April 22, 2014

KENNEDY LILLIS SCHMIDT & ENGLISH
Attorneys for Petitioner
LUKOIL PAN AMERICAS, LLC

By: _____

John T. Lillis Jr., Esq.
75 Maiden Lane – Suite 402
New York, New York  10038-4816
Telephone:  212-430-0800

# EXHIBIT 1

June 1, 2000 - This electronic version is for reference only

# ExxonMobil

tanker voyage charter party
ExxonMobil VOY2000

## PREAMBLE

PLACE _____  DATE _____

IT IS THIS DAY AGREED between _____ Owner / Chartered Owner (hereinafter called "Owner") of the _____ Flag MS / SS _____ (hereinafter called "Vessel") and _____ (hereinafter called "Charterer") that the transportation herein provided for shall be performed subject to the terms and conditions of this Charter, which includes this Preamble and Part I and II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II to the extent of such conflict.

## PART I

**(A) VESSEL DESCRIPTION AND POSITION:**

Year built:                       Classed:

Summer Deadweight:              Metric tons on        feet/meters in salt water on assigned summer freeboard.

Maximum Cargo Capacity:         Metric tons        % more or less. Vessel's option.

Cubic capacity for cargo (at 98%):            cubic meters/barrels.

Length overall:        feet/meters        Beam:        feet/meters

Inert Gas System:     ❑ Yes     ❑ No

Crude Oil Wash System:     ❑ Yes        ❑ No. If Crude Oil Wash is required, the allowed pumping hours specified in Part II, Clause 18 (g) shall be increased by a maximum of        hours pursuant to Part II, Clause 18 (g)

Vessel has full segregated ballast tanks (SBT):   ❑ Yes     ❑ No

Vessel has clean ballast tanks (CBT):   ❑ Yes     ❑ No

Cargo Tanks Coated:       ❑ Yes     ❑ No     Type:

Cargo Tanks Coiled:       ❑ Yes     ❑ No     Type:

Last cargo:                     Next to last cargo:

Vessel onboard quantity (gross standard volume) on date of Charter:

Vessel location on date of Charter:

Expected ready to load:

Charter speed in all weather:            knots laden.

**(B) LAYDAYS:**     Commencing:                Cancelling:

**(C) LOADING RANGE(S) / PORT(S) / PLACE(S):** One (1) or        safe

June 1, 2000 - This electronic version is for reference only

(D)  DISCHARGING RANGE(S) / PORT(S) / PLACE(S):  One (1) or          safe

(E)  CARGO QUANTITY:

Full Cargo as defined in Part II, Clause 1 subject to the Maximum Cargo Capacity limits specified in Part I(A); ☐ Yes          ☐ No
or
Part Cargo Minimum                              Metric tons with Charterer's option to load up to Full Cargo as described in this
Paragraph (E); provided Part Cargo Minimum is supplied by Charterer, no deadfreight for Charterer's account whether option
exercised or not.

(F)  CARGO DESCRIPTION:

(G)  FREIGHT RATE:

Freight rate for Full Cargo or Part Cargo Minimum (hereinafter called "Base Freight Rate"):

Freight rate for quantity above Part Cargo Minimum (hereinafter called "Overage Freight Rate"):

(H)  BILLING:

Freight, deadfreight, demurrage and any other monies payable to Owner pursuant to this Charter shall be payable in
United States dollars and invoiced to Charterer at:

and paid to Owner at:

(I)  LAYTIME:          Total Laytime in running hours:

(J)  DEMURRAGE / DEVIATION PER DAY:

In accordance with Part II, Clause 8, demurrage and/or deviation per day shall be based on:

| Summer deadweight of | Metric tons | |
|---|---|---|
| or | | |
| Part Cargo Minimum plus | Metric tons totalling | Metric tons |
| or | | |
| United States dollars | per day pro rata | |

(K)  SPECIAL PROVISIONS:

(L)  INCORPORATED CLAUSE(S):

The following specified Clause(s), the text(s) of which are attached hereto, shall be deemed incorporated in and made
a part of this Part I.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in
duplicate as of the day and year first above written.
WITNESS:

_____
                                                    Owner
_____        By:_____

WITNESS:
                                                 _____
                                                    Charterer
_____        By:_____  _____  _____

June 1, 2000 · This electronic version is for reference only

PART II

1. **DEFINITIONS.** In this Charter: 1
(a) "place" shall mean any berth, dock, anchorage, sea terminal, submarine line, alongside vessel and/or lighter, whether at anchor 2
or underway, and/or any other place to which Charterer is entitled to order Vessel hereunder. 3
(b) "ILL Convention" shall mean the International Load Line Convention, 1966, or any amendment thereof as may be applicable to 4
the voyage(s) to be performed hereunder. 5
(c) "Full Cargo" shall mean a cargo which fills Vessel to its minimum freeboard, as permitted by the ILL Convention, or fills the cubic 6
capacity of Vessel's available cargo spaces, whichever occurs first, after leaving appropriate space in the tanks for the expansion 7
of cargo. 8
(d) "Arrival in Berth" shall mean the completion of mooring of the Vessel when loading or discharging at a sea terminal, Vessel 9
being all fast with gangway down and secure when loading or discharging alongside a wharf/berth or Vessel being all fast alongside 10
a barge, lighter or other vessel when loading from or discharging to a barge, lighter or other vessel. 11
(e) Where it is stipulated herein that the Vessel shall meet some "requirement", such stipulation shall be taken to include any 12
requirement that might be placed upon the Owner, operator, and/or personnel of the Vessel. 13

2. **VESSEL.** 14
(a) **DESCRIPTION / CONDITION.** Owner warrants that, from the time when the obligation to proceed to the loading port(s) or 15
place(s) attaches and throughout Vessel's service under this Charter, Vessel shall be as described in Part I (A). Owner further 16
warrants that, during the period just described, Owner shall exercise due diligence to ensure that Vessel and its hull, machinery, 17
boilers, all tanks and all other equipment including, but not limited to, pipes, pumps, valves, inert gas and crude oil wash systems 18
(if Vessel is so equipped), navigational equipment, heating coils and facilities, shall be fully functional and in good working order 19
and condition and in every way seaworthy and fit to carry cargo and perform the voyage(s) required under this Charter. 20
(b) **COMPLEMENT.** Owner warrants that, during the period described in Paragraph (a) of this Clause, Vessel shall have a full and 21
efficient complement of Master, officers and crew, with adequate training and experience in operating all Vessel's equipment, 22
including, but not limited to, inert gas and crude oil wash systems (if Vessel is so equipped), and that Master and all officers shall 23
possess valid and current certificates/documents issued or approved by the country of Vessel's registry. Owner further warrants 24
the conversational English language proficiency of Master and officer(s) in charge of cargo and bunker oil handling. 25
(c) **COMPLIANCE.** Owner warrants that Vessel shall, during the period described in Paragraph (a) of this Clause, be in full compliance 26
with all applicable international conventions, all applicable laws, regulations and/or other requirements of the country of Vessel registry 27
and of the countries of the port(s) and/or place(s) to which Vessel may be ordered hereunder and all applicable regulations and/or 28
requirements of any terminals or facilities in such port(s) or place(s) where Vessel shall load or discharge. Owner further warrants 29
that Vessel shall have on board, during the subject period, all certificates, records or other documents required by the aforesaid 30
conventions, laws, regulations and/or requirements. 31
(d) **BREACH.** If any of the warranties stipulated in this Clause are breached, any delay resulting therefrom shall not count as laytime 32
or, if Vessel is on demurrage, as time on demurrage, and any expense attributable to such delay shall be for Owner's account. 33
(e) **SALE.** Owner warrants that the Vessel has not been sold, is not on offer to be sold, and will not be offered for sale during the 34
period of this Charter. 35

3. **CLEANING.** 36
(a) Owner shall clean the tanks, pipes and pumps of Vessel at its expense to the satisfaction of Charterer's representative(s). If 37
the cargo specified in Part I (F) is clean product and inspection of the tanks is required, Owner shall gasfree the tanks as 38
necessary. Any time used for tank inspection and any re-inerting of Vessel shall count as laytime or, if Vessel is on demurrage, as 39
time on demurrage. Any time required for cleaning and gasfreeing shall not count as laytime or, if Vessel is on demurrage, as time 40
on demurrage. Compliance with this Clause shall not be deemed compliance with Owner's obligations under Clause 2, which are 41
in no way lessened by this Clause. 42
(b) Vessel shall not be responsible for any admixture, if more than one quality of oil is shipped, nor for contamination or deterioration 43
in quality of the cargo unless the admixture, contamination or deterioration results from (i) unseaworthiness existing at the inception 44
of loading which was discoverable by the exercise of due diligence or (ii) error or fault of the servants of Owner in loading, care 45
or discharging of the cargo. 46

4. **VOYAGE(S).** 47
(a) Vessel shall proceed with utmost dispatch to any port(s) or place(s) as ordered by Charterer in accordance with Part I (C) and 48
there load a cargo as specified in Part I (E) and (F). On completion of loading, Vessel shall then forthwith proceed to any port(s) 49
or place(s) as ordered by Charterer in accordance with Part I (D) and there deliver said cargo. Except when required by reason of 50
Vessel fault, lightering within port limits shall be at Charterer's expense. 51
(b) Vessel shall timely transmit Charterer's voyage instructions in their entirety to the Vessel. Owner shall ensure that Charterer 52
is promptly advised of all accidents to, and/or pollutions involving, the Vessel and of any Vessel system failure. Such advice shall 53
be given by telephone or telex (if by telephone, same shall be confirmed by telex). 54
(c) Owner warrants that, throughout Vessel's service under this Charter, Owner shall have full and valid Protection and Indemnity 55
Insurance ("P&I Insurance") for the Vessel, as described herein, with the P&I Insurance placed with a P&I Club which is a Member 56
of the International Group of P&I Clubs. This P&I Insurance shall be at no cost to Charterer. The P&I Insurance must include full 57
coverage against liability for cargo loss/damage and coverage against liability for pollution for an amount not less than US $1,000 58
Million (One Billion Dollars) per incident. If requested by Charterer, Owner shall promptly furnish to the Charterer proper evidence 59
of such P&I Insurance upon signing this Charter or at any time during the Charter term. The above warranty is to be regarded as an 60
essential part of this Charter, which is conditional on its truth or performance, so that its breach entitles the Charterer, in Charterer's 61
option, to terminate the Charter and/or to recover any damages allowable in law. 62

5. **MAXIMUM CARGO.** In no event shall Charterer be required to provide, nor shall Vessel load, a cargo quantity in excess of a Full 63
Cargo. In addition, Charterer shall not be required to provide a cargo quantity in excess of the maximum cargo capacity specified 64
in Part I (A). All time lost and expense incurred by reason of Vessel loading a quantity of cargo which puts Vessel, at any stage of 65
the voyage(s) hereunder, below the marks permissible under the ILL Convention shall be for Owner's sole account. 66

6. **FREIGHT.** 67
(a) Freight shall be paid at the rate stipulated in Part I (G) and shall be computed on gross quantity as stated on the Bill of Lading 68
and on quantity of documented tank washings if freight thereon is payable in accordance with Clause 33 (a); provided, however, 69
that no freight shall be payable on any quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the 70
marks permissible under the ILL Convention. Deadfreight shall be paid in accordance with Clause 7. Except as provided in Clause 71
18 (h), no deduction from freight shall be made for water and/or sediment contained in the cargo, nor for any claim Charterer or 72
cargo interests may have against Owner or Vessel arising under this Charter or Bills of Lading issued for the cargo. Payment of 73

June 1, 2000 - This electronic version is for reference only

freight shall be made by Charterer without discount upon Charterer's receipt of notice of completion of discharge of cargo at last — 74
discharging place less any disbursements made to Master or Owner's agent(s) at port(s) or place(s) of loading and/or discharging — 75
plus cost of insurance, commissions and expenses on said disbursements and any other costs incurred by Charterer on Owner's — 76
behalf pursuant to this Charter. — 77
(b) WORLDSCALE. Unless otherwise stipulated herein, all rates, hours, terms and conditions in the Worldwide Tanker Nominal — 78
Freight Scale current on the date of this Charter (hereinafter called "WORLDSCALE") shall apply to this Charter regardless of — 79
when Vessel loads. — 80
(c) If cargo is carried between places and/or by a route for which no rate is expressed in WORLDSCALE, then, in the absence of — 81
agreement as to the freight rate, the parties hereto will apply to either of the publishers of WORLDSCALE for a binding determination — 82
of an appropriate WORLDSCALE rate. — 83
(d) Regardless of whether or not the freight specified in Part I (G) is lumpsum, for the purposes of Section 4(5) of the Carriage of — 84
Goods by Sea Act of the United States, or the corresponding provisions of any international regime that may otherwise apply in — 85
accordance with Clause 27, Owner and Charterer agree that the customary freight unit, shipping unit or unit (as the case may be) — 86
of the cargo is Metric ton. — 87

7.  DEADFREIGHT. Should the entire cargo quantity specified in Part I (E) not be supplied, Master shall give immediate notice to — 88
Charterer by electronic mail, telex, facsimile or radio that such cargo quantity has not been furnished, indicating shortage, and — 89
shall then await Charterer's instructions. Should Charterer fail to provide further cargo, Vessel, upon request of Charterer, shall — 90
then proceed on its voyage provided that the tanks in which the cargo is loaded are sufficiently filled to put it in a seaworthy condition. — 91
If any delay is caused to Vessel by reason of Master waiting for Charterer's instructions as aforesaid, such delay shall count as — 92
laytime or, if Vessel is on demurrage, as time on demurrage and any expense incurred by Vessel attributable solely to such delay — 93
shall be for Charterer's account. Deadfreight shall be paid at the Base Freight Rate on the shortage (being the difference between — 94
the cargo quantity specified in Part I (E) and the quantity loaded as shown on the Bills of Lading) provided such deadfreight charge — 95
is fully documented by cable advice from Master or by deadfreight certificate. Charterer shall be credited with any freight on — 96
residues earned by Owner in accordance with Clause 33(a)(iii). — 97

8.  DEMURRAGE / DEVIATION RATE. The rate for demurrage and/or deviation shall be the fixed dollar figure specified in Part I (J) — 98
or the rate derived by determining the applicable rate from the WORLDSCALE Demurrage Table for tonnage specified in Part I (J) — 99
and multiplying that rate by the Base Freight Rate. If a Part Cargo Minimum basis is specified in Part I (E) and Charterer exercises — 100
its option to load additional cargo, any demurrage and/or deviation shall, nevertheless, remain payable at either the aforesaid fixed — 101
dollar rate or at the aforesaid rate based on the tonnage specified in Part I (J), whichever is applicable. The applicable rate under — 102
this Clause shall hereinafter be called "Demurrage Rate" or "Deviation Rate" as is appropriate. — 103

9.  LOADING AND DISCHARGING PORT(S) / PLACE(S). — 104
(a) Charterer shall nominate loading or discharging port(s) and/or place(s) or order Vessel to a destination for orders. If Vessel is — 105
ordered to a destination for orders, Charterer shall thereafter nominate loading or discharging port(s) and/or place(s). All such — 106
nominations or orders shall be made in sufficient time to avoid delay to Vessel. — 107
(b) CHANGE OF DESTINATION. After nominating loading and/or discharging port(s) or place(s) pursuant to Paragraph (a) of — 108
this Clause, Charterer may nominate new port(s) or place(s), whether or not they are within the range of the previously nominated — 109
port(s) or place(s) and/or vary the rotation of any nominated port(s) or place(s) and Owner shall issue instructions necessary to — 110
make such change(s). It is understood and agreed, however, that the aforesaid option to nominate new loading port(s) or place(s) — 111
in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated loading port or place and that aforesaid — 112
option to nominate new discharging port(s) or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at — 113
a nominated discharging port or place. If a change to, or varying the rotation of, nominated port(s) or place(s) occurs or if Vessel — 114
is sent to a destination for orders, any time by which the steaming time to the port(s) or place(s) to which Vessel is finally ordered — 115
exceeds that which would have been taken if Vessel had been ordered to proceed to such port(s) or place(s) in the first instance — 116
shall be compensated at the Deviation Rate per running day and pro rata for a part thereof. In addition, Charterer shall pay for — 117
extra bunkers consumed during such excess time at Owner's documented actual replacement cost at the port where bunkers are — 118
next taken. — 119
(c) Any order of Vessel to a destination for orders, all nominations and any renominations pursuant to this Clause shall be consistent — 120
with Part I (C) and (D). — 121

10. ESTIMATED TIME OF ARRIVAL (ETA). — 122
(a) Unless otherwise instructed, the following Estimated Time of Arrival (ETA) notifications shall be given. As soon as commencing — 123
the voyage to the nominated loading port(s) or place(s), Master shall advise Charterer and Vessel's agent of Vessel's estimated — 124
date and time of arrival at the nominated loading port(s) or place(s). Further, provided the length of the voyage permits, Master — 125
shall confirm or amend such advice seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at the loading — 126
port(s) or place(s). On leaving the final loading port or place, Master shall advise Charterer and Vessel's agent of Vessel's estimated — 127
date and hour of arrival at the nominated discharging port(s) or place(s). Further, provided the length of the voyage permits, — 128
Master shall confirm or amend such advice seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at — 129
the discharging port(s) or place(s). In addition, on leaving the final loading port or place, Master shall advise Charterer of expected — 130
maximum draft at arrival and, provided the length of voyage permits, shall confirm or amend such advice no later than seventy-two — 131
(72) hours prior to Vessel's arrival at the discharging port(s) or place(s). — 132
(b) An alteration of more than three (3) hours in the twenty-four (24) hour notice or an alteration of more than twelve (12) hours — 133
in any other advice given pursuant to Paragraph (a) of this Clause shall be advised by Master to Charterer and Vessel's agent. — 134
(c) If, for any reason, Vessel is unable to trim to even keel for arrival at the discharging port(s) or place(s), Master shall give notice — 135
of this to Charterer as soon as possible after receiving such loading instructions but no later than sailing from the final loading port — 136
or place. Such notice shall include Vessel's estimated arrival draft forward and aft. — 137
(d) If Master fails to comply with the requirements of Paragraphs (a), (b) and/or (c) of this Clause, any delay resulting therefrom — 138
at loading and/or discharging port(s) or place(s) shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. — 139
(e) At each loading and discharging port or place, Master or Vessel's agent shall promptly notify Charterer of the dates and times — 140
the following events occurred; — 141
•    Notice of Readiness to load/discharge tendered; — 142
•    At fast; — 143
•    Hoses connected; — 144
•    Hoses disconnected; — 145
•    All cargo documents on board; and — 146
•    Vessel sailed. — 147
(f) All advices and notifications required by this Clause shall be made by electronic mail, telex, facsimile or radio (if radio, — 148

subsequently confirmed in writing). 149

11. **NOTICE OF READINESS.** Upon arrival at customary anchorage or waiting place at each loading and discharging port or place, 150
Master or Vessel's agent shall give Charterer or its representative notice by letter, electronic mail, telex, facsimile, radio or telephone 151
(if radio or telephone, subsequently confirmed promptly in writing) that Vessel is in all respects ready to load or discharge cargo, 152
berth or no berth. 153

12. **CANCELLATION OF CHARTER.** If Vessel has not tendered a valid Notice of Readiness by 1600 hours local time on the 154
Cancelling Date specified in Part I (B), Charterer shall have the right to cancel this Charter by notifying Owner or Owner's agent 155
by telephone, electronic mail, telex or facsimile (if telephone, subsequently confirmed promptly in writing) of such cancellation within 156
forty-eight (48) hours local time after expiration of the said Cancelling Date, failing which this Charter shall remain in full force and 157
effect. Charterer's said option shall continue to apply even if Vessel tenders Notice of Readiness within the just-mentioned forty-eight 158
(48) hour period. However, if Vessel is delayed by reason of Charterer's change of orders pursuant to Clause 9 and/or by ice risks 159
as stipulated in Clause 21, the said Cancelling Date shall be extended, with the option of cancellation as aforesaid, by any time 160
so directly lost. Cancellation or failure to cancel shall be without prejudice to any claims for damages Charterer may have for late tender 161
of Vessel's services. 162

13. **LAYTIME / DEMURRAGE.** 163
(a) **COMMENCEMENT / RESUMPTION.** Laytime or time on demurrage, as herein provided, shall commence or resume upon 164
the expiration of six (6) hours after receipt by Charterer or its representative of Notice of Readiness or upon Vessel's Arrival in 165
Berth, whichever occurs first. Laytime shall not commence before 0600 hours local time on the Commencing Date specified in 166
Part I (B) unless Charterer shall otherwise agree, in which case laytime shall commence upon commencement of loading. 167
(b) **EARLY LOADING.** In the event Charterer agrees to load Vessel prior to commencement of laydays, laytime will begin at 168
commencement of loading and the amount of time from commencement of loading until 0600 hours local time on the commencing 169
date specified in Part I (B), shall be added to the laytime specified in Part I (I). 170
(c) **DURATION.** The laytime specified in Part I (I) shall be allowed free of expense to Charterer for the purpose of loading and 171
discharging cargo and all other Charterer's purposes. Laytime or, if Vessel is on demurrage, time on demurrage, shall continue 172
until all cargo hoses have been completely disconnected upon the final termination of the loading or discharging operation. 173
Disconnection of all cargo hoses shall be promptly effected. If Vessel is delayed in excess of two (2) hours after such disconnection 174
of cargo hoses solely for Charterer's purpose, laytime or, if Vessel is on demurrage, time on demurrage shall resume upon the 175
expiration of said two (2)-hour period and shall continue from that point until the termination of such delay. 176
(d) **PAYMENT.** Charterer shall pay demurrage per running day and pro rata for a part thereof for all time by which the allowed 177
laytime specified in Part I (I) is exceeded by the time taken for loading and discharging and for all other Charterer's purposes and 178
which, under this Charter, counts as laytime or as time on demurrage. 179

14. **LAYTIME / DEMURRAGE CONSEQUENCES.** 180
(a) **SPECIFIED.** Any delay to Vessel after the expiration of six (6) hours from Charterer's receipt of Notice of Readiness before 181
Arrival in Berth or any delay to Vessel after Arrival in Berth, due to unavailability of berth (prior to Arrival in Berth), unavailability of 182
cargo, or solely for Charterer or terminal purposes, shall count as laytime or, if Vessel is on demurrage, as time on demurrage. 183
(b) **HALF-RATE DEMURRAGE.** If demurrage is incurred and the Vessel has been delayed in berthing, loading and/or discharging 184
(hereinafter in this Paragraph (b) called "Delay") due to: weather and/or sea conditions (irrespective of any option given in Part I 185
(C) and (D)); fire; explosion; strike, picketing, lockout, slowdown, stoppage or restraint of labor; breakdown of machinery or equipment 186
in or about the facilities of Charterer, supplier, shipper or consignee of the cargo (hereinafter in this Paragraph (b) separately and 187
jointly called "Listed Conditions"), be the Delay prior to or after the expiration of laytime, that span of time or demurrage equal to 188
the period or periods of Delay as just described shall be paid at half of the Demurrage Rate. If, during a period of Delay, Listed 189
Conditions co-existed, along with any of the other conditions described in Paragraph (a) of this Clause 14, the Listed Conditions 190
shall conclusively be deemed to be sole cause of the Delay, either if they caused the Delay independently of the other conditions 191
or could have caused the Delay if the other conditions had not so co-existed. Weather and/or sea conditions shall include, but not 192
be limited to, lightning, restricted visibility (the term "restricted visibility" shall mean any condition in which visibility is restricted by 193
fog, mist, falling snow, heavy rainstorms, sandstorms and any other similar causes), storm, wind, waves and/or swells. The foregoing 194
provisions as to payment of half the Demurrage Rate in respect to weather and/or sea conditions shall not apply where the Vessel 195
is lightered or discharged at sea. 196
(c) **EXCLUSIONS.** Notwithstanding the provisions of any other Paragraph of this Clause or any other Clause of this Charter 197
to the contrary, time shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, if such time is spent or lost: 198
(i) As a result of labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, 199
officers or crew of Vessel or tugboats or pilots unless, in the case where Charterer has load/discharge port options, a labor dispute, 200
strike, go slow, work to rule, lockout, stoppage or restraint of labor of tug boats or pilots, is in force at the port at the time Charterer 201
nominated such port; 202
(ii) On an inward passage, including, but not limited to, awaiting daylight, tide, tugs or pilot, and moving from anchorage 203
or other waiting place, even if lightering has taken place at the anchorage or other waiting place, until Vessel's Arrival in Berth; 204
(iii) Due to overflow, breakdown, inefficiency, repairs, or any other conditions whatsoever attributable to Vessel, Master, 205
officers, crew and/or Owner, including inability to load or discharge the cargo within the time allowed and/or failure to meet Vessel 206
warranties stipulated in this Charter; 207
(iv) Due to Owner or port authority prohibiting loading or discharging; 208
(v) By reason of local law or regulations, action or inaction by local authorities (including, but not limited to, Coast 209
Guard, Naval, Customs, Immigration or Health authorities), with the exception, however, of port closure due to weather and/or sea 210
conditions; 211
(vi) In ballasting or deballasting, lining up and/or draining of pumps/pipelines, cleaning of tanks, pumps, pipelines, 212
bunkering or for any other purposes of the Vessel only, unless same is carried out concurrent with loading and/or discharging so 213
that no loss of time is involved; or 214
(vii) Due to an escape or discharge of oil or the threat of an escape or discharge of oil on or from Vessel. (The phrase 215
"threat of an escape or discharge of oil" shall for the purposes of this paragraph (vii) mean a grave and imminent danger of the 216
escape or discharge of oil which, if it occurred, would create a serious danger of pollution damage). 217
(d) **OTHER REFERENCES.** Laytime and demurrage references are also contained in the following Clauses: 218

| Clause: | 2 (d) | Vessel-Breach | 219 |
|---|---|---|---|
| | 3 (a) | Cleaning | 220 |
| | 5 | Maximum Cargo | 221 |
| | 7 | Deadfreight | 222 |
| | 8 | Demurrage/Deviation Rate | 223 |

June 1, 2000 - This electronic version is for reference only

| 10 | (d) | Estimated Time of Arrival (ETA) | 224 |
| 13 | | Laytime/Demurrage | 225 |
| 15 | (a) | Lightering/Discharge at Sea/Cargo Advisor | 226 |
| 16 | (c) and (d) | Shifting and Off Berth | 227 |
| 17 | (c) | Cargo Measurement | 228 |
| 18 | (a) (c) (d) (f) and (g) | Pumping In and Out | 229 |
| 19 | | Back Loading | 230 |
| 21 | (b) | Ice-At Port | 231 |
| 22 | | Dry Cargo | 232 |
| 23 | | Quarantine | 233 |
| 24 | (b) | Inspection-Bunker Sampling | 234 |
| 25 | | Heat | 235 |
| 27 | (c) | Bills of Lading | 236 |
| 29 | (b) | Exceptions | 237 |
| 33 | (a) | Clean Seas-Handling of Tank Washings | 238 |
| 36 | | Waiver of Claims | 239 |

(e)  UNSPECIFIED.  Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other 240
Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is 241
on demurrage, as time on demurrage. If demurrage is incurred, on account of such delays, it shall be paid at half the Demurrage 242
Rate. 243

15.       LIGHTERING / DISCHARGE AT SEA / CARGO ADVISOR. 244
(a)  Except when required by reason of fault attributable to Vessel, any lightering or discharge at sea or at a place outside a port 245
shall be at the expense of Charterer and, notwithstanding Clauses 11, 13 (a) and 14 (a) and (b), time used for such lightering or 246
discharge shall count as laytime or as time on demurrage, as provided below: 247
(i)  If Vessel is lightered at sea or at a place outside a port, time on demurrage shall 248
commence when Vessel arrives at the lightering site designated by Charterer and shall end when disconnecting of the cargo hoses 249
from the last cargo receiving vessel has been completed. 250
(ii)  If Vessel is fully discharged at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage 251
shall commence upon the expiration of six (6) hours after Vessel arrives at the lightering site designated by Charterer or when Vessel 252
is all fast alongside the first cargo receiving vessel, whichever occurs first, and end when disconnection of the cargo hoses from the 253
last cargo receiving vessel has been completed. 254
(b)  If Vessel is fully discharged at sea, freight payment shall, in the absence of agreement as to the appropriate freight rate, be 255
based on the freight rate stipulated in Part I (G) multiplied by a flat rate which shall be obtained from the Worldscale Association 256
(London) Limited or the Worldscale Association (NYC) Inc.  If Vessel is lightered at sea, the lightering site shall not constitute a 257
port or place additional to those specified in Part I (D) and the freight rate for the voyage shall be the same as if the lightering had 258
not taken place.  Charterer, however, shall reimburse Owner for any time by which the steaming time to the final discharging port 259
or place exceeds that which would have been taken if Vessel had not lightered at the Deviation Rate per day or pro rata for a part 260
thereof.  In addition, Charterer shall pay for extra bunkers consumed in lightering, based upon such excess time at Owner's documented 261
actual replacement cost at the port where bunkers are next taken. 262
(c)  With respect to any loading or discharging in port or at sea, Charterer may, at its option and cost, place on the Vessel one or 263
more cargo advisors to monitor the loading, lightering and/or discharge of cargo and, if applicable, the inert gas and/or crude oil 264
washing. It is understood and agreed however, that the Master and Owner shall continue to be fully and solely responsible for the 265
operation, management and navigation of Vessel during the entire loading, lightering and/or discharging operation. 266

16.       LOADING / DISCHARGING PLACE. 267
(a)  Vessel shall not be required to berth where the maximum draft of Vessel is greater than the depth of water at low tide.  In such 268
cases, Charterer undertakes to discharge sufficient cargo into vessels and/or lighters within port limits to enable Vessel to safely 269
reach and berth always afloat. 270
(b)  SAFE LOCATION(S).  Charterer shall exercise due diligence to order Vessel to port(s) or place(s) which are safe for Vessel 271
and where it can lie always safely afloat.  Notwithstanding anything contained in this or any other Clause in this Charter to the contrary, 272
Charterer shall not be deemed to warrant the safety of any such port(s) or place(s) and shall not be liable for any loss, damage, 273
injury or delay resulting from any unsafe condition at such port(s) or place(s) which could have been avoided by the exercise of 274
reasonable care on the part of the Master or Owner. The term "safe", as used in Part I (C) and (D), shall be construed to be consistent 275
with Charterer's obligation as set forth in this Paragraph (b). 276
(c)  SHIFTING.  Charterer shall have the right to shift Vessel within any port of loading and/or discharging from one loading or discharging 277
place back to the same or to another such place once or more often.  In the event that Charterer exercises this right, Charterer 278
shall pay all additional expenses properly incurred, including additional Bunkers.  Time spent shifting shall count as laytime or, if 279
Vessel is on demurrage, as time on demurrage. For purposes of freight payment, the places grouped in port and terminal combinations 280
in WORLDSCALE are to be considered as berths within a single port, with Charterer paying shifting expenses in accordance with 281
the foregoing. 282
(d)  OFF BERTH. Charterer or terminal operator shall have the right to shift Vessel from a loading and/or discharging place if 283
Vessel fails to meet the pumping and/or heating warranties stipulated in Clauses 18 and 25 so as to avoid delay to other vessels 284
waiting to use such place. Charterer or terminal operator shall also have the right to shift Vessel from a loading and/or discharging 285
place due to an unsafe condition of Vessel. In such situation(s), Charterer shall not be obliged to provide an alternative loading or 286
discharging place to the place from which Vessel was shifted. However, Charterer shall exercise due diligence to arrange prompt 287
reberthing and commencement of loading or discharging once Vessel has corrected deficiency(ies). All expenses related to this 288
shifting and any reberthing shall be for Owner's account and all time lost by reason of the foregoing shall not count as laytime or, 289
if Vessel is on demurrage, as time on demurrage. An Off Berth reference is also contained in Clause 24 (b). 290

17.       CARGO MEASUREMENT. 291
(a)  Prior to loading, Master shall measure the on board quantities of oil, water and sediment residues which are segregated in all 292
holding tanks and slop tanks and those which remain in cargo tanks and, if requested, shall advise supplier(s) and Charterer of 293
such quantities. After loading, Master shall determine the cargo quantities loaded, expressing these cargo quantities in barrels at 294
standard temperature (60°F), using for such calculations the latest Manual of Petroleum Measurement Standards issued by the 295
American Petroleum Institute (API MPMS) or similar standards issued by the American Society for Testing and Materials. A written 296
tank-by-tank ullage report containing all measurements of oil, water and sediment residues on board prior to loading and quantities 297
of cargo loaded shall be prepared and promptly submitted by Master to Charterer. 298

June 1, 2000 - This electronic version is for reference only

(b) If Master's calculations of cargo loaded (oil, water and sediment residues on board excluded), after applying the Vessel's | 299
Experience Factor (VEF), show any deficiency from the Bill of Lading figures, Master shall, if investigation and recalculation verify | 300
such deficiency, issue a Letter of Protest to supplier(s) (which should, if practical, be acknowledged) and shall advise Charterer of | 301
such deficiency immediately by electronic mail, telex or radio and thereafter shall send a copy of the Letter of Protest to Charterer. | 302
Vessel shall have on board sufficient historical information for the calculation of a VEF using the latest edition of the API MPMS. | 303
Master shall calculate and apply the VEF as so determined during all loadings. | 304
(c) Prior to discharging, Master shall measure the quantity of each grade of cargo on board, expressing these quantities in barrels | 305
at standard temperature (60°F), using the same calculation procedures specified in Paragraph (a) of this Clause. Before and after | 306
discharging, Master shall cooperate with shore staff to ascertain discharged quantities. Vessel shall be obliged to discharge all liquid | 307
oil and, if ordered by Charterer, any residues of oil, water and sediment. Vessel's just-mentioned obligation shall not in any way be | 308
qualified or limited by any purported custom of the trade which is based on a stated in-transit loss or which otherwise would excuse | 309
Vessel from discharging all liquid cargo and residues. | 310
(d) An inspector may be employed by Charterer at its expense to verify quantities and qualities of cargo and residues on board | 311
Vessel at both loading and discharging port(s) and/or place(s). If Vessel is equipped with an Inert Gas System, depressurization | 312
of tanks to permit ullage measurements shall be allowed in accordance with the provisions of the most recent Inert Gas Systems | 313
for Oil Tankers publication issued by the International Maritime Organization (IMO). Any time used solely for such inspections | 314
and/or measurements shall count as laytime or, if Vessel is on demurrage, as time on demurrage. | 315

18. **PUMPING IN AND OUT.** | 316
(a) Hoses for loading and discharging shall be furnished by Charterer and shall be connected and disconnected by Charterer or | 317
by Owner, at Charterer's option. When Vessel loads and/or discharges at sea terminal(s), Vessel shall be properly equipped, at | 318
Owner's expense, for operations at such terminal(s), including suitable anchors, ground tackle, mooring lines and equipment for | 319
handling submarine hoses. Vessel shall also be properly equipped with a sufficient number of cargo manifold reducing pieces of | 320
steel or comparable material (excluding aluminum and gray cast iron) which meet the most recent Oil Companies International | 321
Marine Forum (OCIMF) standards, to make available appropriate flanges for cargo hoses/arms at all manifold connections on one | 322
side of Vessel. If Vessel is not properly equipped as required in this Paragraph (a), any time thereby lost shall not count as laytime | 323
or, if Vessel is on demurrage, as time on demurrage. | 324
(b) The cargo shall be pumped into Vessel at the expense and risk of Charterer only up to Vessel's permanent hose connections. | 325
The cargo shall be discharged from Vessel at the expense and risk of Owner only up to Vessel's permanent hose connections. | 326
Vessel shall provide all necessary pumps, power, and hands required on board for mooring and unmooring, connecting and | 327
disconnecting of hoses and loading and discharging. If requested by Charterer, Vessel shall load and/or discharge more than one | 328
grade simultaneously if Vessel is technically capable of doing so. | 329
(c) Owner warrants that Vessel shall arrive at the loading place(s) with cargo tanks properly inerted and that such tanks shall so | 330
remain inerted throughout the loading of the cargo, the voyage and the subsequent discharging of the cargo. In case of an Inert | 331
Gas System failure during loading and/or discharging, cargo operations shall be suspended immediately until the System becomes | 332
fully operational, any deficiency in inerting is fully corrected and the terminal (or other loading and/or discharging facility) has given | 333
permission to resume operations. Time used from cessation to resumption of cargo operations shall not count as laytime or, if | 334
Vessel is on demurrage, as time on demurrage. | 335
(d) If required by Charterer, Vessel, after discharging, shall clear shore pipelines of cargo by pumping water through them and the | 336
time thereby consumed shall count as laytime or, if Vessel is on demurrage, as time on demurrage. | 337
(e) All overtime incurred by officers and crew in loading and/or discharging shall be for the account of Owner. | 338
(f) Vessel shall load at rates requested by Charterer having due regard for the safety of Vessel. Owner warrants that Vessel shall | 339
discharge entire cargo (be it one or more grades) within twenty-four (24) hours pumping time or maintain 100 psi pressure at | 340
Vessel's rail during the entire period of discharge provided shore facilities permit. All time lost as a result of Vessel being unable | 341
to discharge its cargo in accordance with the pumping warranty above shall not count as laytime or, if Vessel is on demurrage, as | 342
time on demurrage. If the terminal or place of discharging does not allow or permit Vessel to meet the above warranty or requires | 343
discharging grades consecutively, Master shall forthwith issue a Letter of Protest (which should, if practical, be acknowledged) to | 344
such terminal or place and shall immediately advise Charterer by electronic mail, telex or radio. If Master fails to issue the Letter | 345
of Protest, Owner shall be deemed to waive any rights to contest that time was lost as a result of Vessel's failure to comply with | 346
the above pumping warranty. Any pumping time lost solely due to restrictions imposed by the terminal or place of discharging shall | 347
count as laytime or, if Vessel is on demurrage, as time on demurrage. | 348
(g) Charterer shall have the right to require Vessel, if it is so equipped, to Crude Oil Wash the cargo tanks and, in such case, the | 349
allowed pumping hours (i.e. the twenty-four (24) hours of pumping time specified in Paragraph (f) of this Clause or the number of | 350
pumping hours taken to discharge the entire cargo when Vessel maintains the applicable rail pressure in accordance with | 351
Paragraph (f) of this Clause, whichever is applicable) shall be increased by the maximum hours specified in Part I (A) for Crude | 352
Oil Wash operations. If less than all of the tanks are washed, the said maximum hours shall be prorated on the basis of the number | 353
of tanks washed to the total number of cargo tanks and the hours resulting from such proration shall be added to the allowed pumping | 354
hours. If Crude Oil Wash is not conducted, Charterer shall have the right to require Vessel to remain at berth for clingage rundown | 355
or other cargo recovery technique. The time for such clingage rundown or other cargo recovery technique shall not exceed ten | 356
(10) hours and the time so used shall count as laytime or, if Vessel is on demurrage, as time on demurrage. | 357
(h) In the event that any liquid cargo remains on board at completion of discharge for the final voyage under the Charter, then | 358
Charterer shall have the right to deduct from freight an amount equal to the Free On Board (FOB) port of loading value of such | 359
cargo plus freight due with respect thereto. The quantity and quality of such liquid hydrocarbon material shall be determined by a | 360
mutually agreeable independent cargo inspector. The quantity of Remaining On Board (ROB) material shall be measured using | 361
the Vessel's wedge tables. If available, or otherwise by wedge formula. | 362

19. **BACK LOADING.** Charterer shall have the option of loading Vessel with a part cargo at any discharging port or place to which | 363
Vessel may have been ordered, provided that such part cargo is as described in Part I (F) and is compatible with cargo then on | 364
board. Owner shall discharge such part cargo at any other discharging port(s) or place(s) previously nominated, provided such | 365
port(s) or place(s) lie within the rotation of the discharging ports or places previously nominated. If this option is exercised, additional | 366
time consumed awaiting berth and/or cargo and/or tank preparation and/or loading and discharging such part cargo shall count | 367
as laytime or, if Vessel is on demurrage, as time on demurrage. Any additional expenses, including port charges, incurred as sole | 368
result of loading and discharging such part cargo shall be for Charterer's account. | 369

20. **DUES, TAXES AND OTHER CHARGES.** | 370
(a) Unless otherwise specified in WORLDSCALE and to the extent not prohibited by law, dues, taxes and other charges upon | 371
Vessel (including those assessed on the quantity of cargo loaded or discharged or on the freight) shall be paid by Owner and dues, | 372
taxes and other charges on the cargo shall be paid by Charterer. Vessel shall be free of charges for the use of any place(s) | 373

June 1, 2000 - This electronic version is for reference only

arranged by Charterer solely for the purpose of loading or discharging cargo. However, Owner shall be responsible for charges for   374
any such place(s) when used solely for Vessel's purposes, such as, but not limited to, awaiting Owner's orders, tank cleaning,   375
repairs, before, during or after loading and/or discharging.   376
    (b) Notwithstanding the provisions of Clause 20(a), dockage and wharfage shall be deemed included in the freight rate specified   377
in Part I (G).   378

21.   ICE.   379
    (a) DURING VOYAGE. In case a nominated port or place of loading or discharging should be inaccessible due to ice, Master shall   380
immediately notify Charterer by electronic mail, telex or radio, requesting revised orders and shall remain safely outside the ice-bound   381
area. Charterer shall give orders for another port or place which is free from ice and where there are facilities for the loading or   382
discharging of the cargo in bulk. In this event, freight shall be paid at the rate stipulated in Part I (G) from or to such alternate port   383
or place and any time by which the steaming time from or to such port or place exceeds that which would have been taken if the   384
Vessel had been ordered to proceed from or to such port or place in the first instance shall be compensated at the Deviation Rate   385
per running day and pro rata thereof. In addition, Charterer shall pay for extra bunkers consumed during such excess time at   386
Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken.   387
    (b) AT PORT. If, on or after Vessel's arrival at the loading or discharging port or place, it is dangerous to remain at such port or   388
place for fear of Vessel being frozen-in or damaged, Master shall notify Charterer who shall give orders for Vessel either to proceed   389
to another port or place where there is no danger of ice and where there are facilities for the loading or discharging of the cargo   390
in bulk or to remain at such original port or place at Charterer's risk. If Vessel is ordered to proceed to another port or place, the   391
sum in respect of freight and place to be paid by Charterer shall be as stipulated in Paragraph (a) of this Clause. If Vessel remains   392
at such original port or place, any time so lost on account of ice shall count as laytime or, if Vessel is on demurrage, as time on   393
demurrage.   394

22.   DRY CARGO. Charterer has the option of shipping packaged and/or general cargo (including oils and bitumen in drums) in the   395
available dry cargo space. Freight shall be payable on such cargo in accordance with Clause 6 at the Base Freight Rate and   396
Charterer shall pay, in addition, all expenses, including port dues, incurred solely as a result of the packaged and/or general cargo   397
being carried. The time used loading and discharging such dry cargo shall count as laytime or, if Vessel is on demurrage, as time   398
on demurrage, but only to the extent that such time is not concurrent with time used loading and discharging the oil cargo.   399

23.   QUARANTINE. Time lost at any port or place due to quarantine shall not count as laytime or, if Vessel is on demurrage, as time   400
on demurrage unless such quarantine was in force at the time when such port or place was nominated by Charterer.   401

24.   INSPECTION.   402
    (a) OPERATIONS. Charterer's representative(s) shall have the right at loading and/or discharging port(s) or place(s) to inspect   403
Vessel and observe operations. Owner shall instruct Master to give every assistance so as to enable said representative(s) to properly   404
observe operations throughout Vessel.   405
    (b) BUNKER SAMPLING. Charterer's representative(s) shall have the right to survey and take samples of all Vessel's bunker   406
tanks and non-cargo spaces. Refusal by Master to permit such bunker surveying and sampling shall give Charterer or terminal   407
operator the right to order Vessel off berth. All time lost by reason of such refusal, including any time used in shifting Vessel off   408
and back to berth, shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Further, all expenses related to   409
such refusal, including Vessel shifting expenses, shall be for Owner's account. Any delay to Vessel caused solely by bunker surveying   410
and sampling shall count as laytime or, if Vessel is on demurrage, as time on demurrage.   411

25.   HEAT. If Vessel is described as coiled in Part I (A), Owner warrants that Vessel is capable of heating the cargo up to and maintaining   412
it at a maximum temperature of 135°F/57°C. However, unless otherwise requested by Charterer, Vessel shall only be required to   413
maintain the cargo at the temperature loaded (up to a maximum of 135°F/57°C) throughout the voyage and the entire discharge.   414
If requested by Charterer and if the length of the voyage allows, Vessel shall increase and maintain the temperature of the cargo   415
from the loaded temperature to a temperature specified by Charterer, up to a maximum of 135°F/57°C, and Charterer shall pay   416
for extra bunkers consumed solely in increasing the temperature as aforesaid at Owner's documented actual replacement cost for   417
such bunkers at the port where bunkers are next taken. If Vessel fails to maintain the loaded temperature or to increase and maintain   418
the temperature of the cargo, as requested by Charterer, Charterer shall have the option to hold Vessel off berth and/or to suspend   419
discharging, all until the cargo is properly heated, all time and expense in connection with the foregoing being for Owner's account.   420

26.   BUNKERS. When, in connection with the performance of any voyage provided for in this Charter, Owner plans to purchase   421
bunkers at any port(s) outside the United States or its territories, Owner shall purchase the bunkers from Charterer or its designated   422
Affiliate(s) whenever they are so available at competitive prices. In the event lower prices are quoted by Owner by any supplier at   423
the port(s) in question, Owner shall give Charterer or its designated Affiliate(s) the opportunity to meet such quotation.   424

27.   BILLS OF LADING.   425
    (a) Bills of Lading shall be signed by Master as presented, Master attending daily, if required, at the offices of Charterer or its   426
agents. However, at Charterer's option, Charterer or its agents may sign Bills of Lading on behalf of Master. All Bills of Lading   427
shall be without prejudice to this Charter and Charterer shall indemnify Owner against all consequences or liabilities which may   428
arise from any inconsistency between this Charter and any Bills of Lading or other documents signed by Charterer or its agents   429
or by Master at their request or which may arise from an irregularity in papers supplied by Charterer or its agents.   430
    (b) Notwithstanding anything in this Charter to the contrary, the carriage of cargo under this Charter and under all Bills of Lading   431
issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through   432
(vi) of this Clause and such terms shall be incorporated verbatim or be deemed incorporated by reference in any such Bill of   433
Lading. In such sub-paragraphs and in any Act referred to therein, the word "Carrier" shall include Owner and Chartered Owner   434
of Vessel.   435
      (i)  CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods By   436
Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act,   437
ordinance or legislation gives statutory effect to the International Convention for the Unification of certain Rules relating to Bills of   438
Lading at Brussels, August 1924, then this Bill of Lading shall have effect subject to the provisions of such Act, ordinance or legislation.   439
The applicable Act, ordinance or legislation (hereinafter called "Act") shall be deemed to be incorporated herein and nothing herein   440
contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities   441
or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that   442
extent but no further.   443
      (ii)  JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the   444
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the   445
Carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute   446
with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may   447
be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated   448

by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the 449
Carrier or his Agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges 450
thereon shall, if required, be made by the cargo shippers, consignees or owners of the cargo to the Carrier before delivery. 451
    (iii)  GENERAL AVERAGE. General Average shall be adjusted, stated, and settled according to the York Antwerp Rules 452
1994 ("Rules") and, as to matters not provided for by those Rules, according to the laws and usages at the port of New York; provided 453
that, when there is an actual escape or release of oil or pollutant substances from the Vessel (irrespective of Vessel location), the 454
cost of any measures, contained or undertaken on that account, to prevent or minimize pollution or environmental damage shall 455
not be allowable in General Average; and, provided further, that any payment for pollution damage (as defined in Article I 6.(a) of 456
the 1992 Protocol to the International Convention on Civil Liability for Oil Pollution Damage) shall also not be allowable in General 457
Average. It is understood and agreed, however, that the cost of measures to prevent pollution or environmental damage, undertaken 458
in respect of oil or pollutant substances which have not escaped or been released from the Vessel, shall be included in General 459
Average to the extent permitted by the Rules. If a General Average statement is required, it shall be prepared at such port by an 460
Adjuster from the port of New York appointed by the Carrier and approved by Charterer of Vessel.  Such Adjuster shall attend to 461
the settlement and the collection of the General Average, subject to customary charges.  General Average Agreements and/or 462
security shall be furnished by Carrier and/or Charterer, and/or Owner, and/or Consignee of cargo, if requested.  Any cash deposit 463
being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by the 464
Adjuster at the Adjuster's risk in a special account in a duly authorized and licensed bank at the place where the General Average 465
statement is prepared. 466
    (iv)  BOTH TO BLAME.  If Vessel comes into collision with another ship as a result of the negligence of the other ship, 467
and any act, neglect or default of Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of 468
Vessel, the owners of the cargo carried hereunder shall indemnify the Carrier against all loss or liability to the other or non-carrying 469
ship or its owners insofar as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of said 470
cargo, paid or payable by the other or recovered by the other or non-carrying ship or its owners as part of their claim against the 471
carrying ship or Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or 472
objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact. 473
    (v)  LIMITATION OF LIABILITY.  Any provision of this Charter to the contrary notwithstanding, the Carrier shall have 474
the benefit of all limitations of, and exemptions from, liability accorded to owner or chartered owner of vessels by any statute or 475
rule of law for the time being in effect. 476
    (vi)  DEVIATION.  Vessel shall have liberty to sail with or without pilots, to tow or be towed, to go to the assistance of 477
vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call 478
for fuel at any port or ports in or out of the regular course of the voyage. 479
(c) Except as provided in Paragraph (d) of this Clause, Owner and Vessel shall not be required to deliver cargo at a discharging 480
port or place nominated by Charterer unless the party claiming right to such delivery shall first surrender to Vessel at such port or 481
place one of the original Bills of Lading issued for the cargo, duly endorsed; provided however that, if the Bills of Lading name specific 482
port(s) or place(s) of discharging and the nominated port or place is different or if the Bills of Lading provide for discharge at port(s) 483
or place(s) as ordered, Owner and Vessel shall not be required to deliver the cargo unless the party claiming right to such delivery 484
first surrenders to Vessel all the original Bills of Lading, duly endorsed. The foregoing shall apply even in the situation where one 485
but not all of the original Bills of Lading have been placed on board Vessel at loading but, in such case, only the original Bill(s) of 486
Lading not on board Vessel need first to be surrendered to Vessel in accordance with the foregoing requirements. Any delay to 487
Vessel at the nominated port or place due to the unavailability at such port or place of original Bill(s) of Lading and/or the failure 488
to timely surrender such Bill(s) of Lading to Vessel in accordance with the foregoing requirements shall count as laytime or, if Vessel 489
is on demurrage, as time on demurrage. 490
(d) If original Bill(s) of Lading are not available at the discharging port or place for timely surrender to Vessel as provided in 491
Paragraph (c) of this Clause, Owner and Vessel shall deliver the cargo to a party and at a facility at the discharging port or place as directed 492
by Charterer in writing by letter, telex, electronic mail or facsimile, if Charterer first executes a written indemnity in connection with 493
such delivery in favor of Owner, Vessel, any Chartered Owner(s) of Vessel, Master, Vessel operators, agents and underwriters and 494
delivers such indemnity to Owner or Owner's designee. The subject indemnity shall meet the requirements of Paragraph (e) of this 495
Clause. 496
(e) The indemnity referred to in Paragraph (d) of this Clause shall be a short form indemnity document incorporating the terms 497
and conditions set forth in Clause 27(f) of this Charter. This document (which must be properly filled in) shall be given to Owner 498
by telex, electronic mail, letter or facsimile as requested by Owner and be in the exact form quoted below, which document, when 499
transmitted, shall be deemed to have been signed by person acting on behalf of Charterer. 500
                                                                                                                                                                    501

'VOYAGE CHARTER OF _____ 502
                                                                                                                                                                    503
DATED _____ 504
                                                                                                                                                                    505
BETWEEN _____, AS OWNER 506
                            AND 507
                _____, AS CHARTERER 508
                                                                                                                                                                    509
Reference is made to the cargo ('Cargo') now laden aboard the above Vessel ('Vessel').  Pursuant to Clause 27(e) of the above 510
captioned Charter ('Charter'), the undersigned requests that Owner(s) of the Vessel deliver the Cargo at 511
_____ unto _____ without prior discharge site presentation to the Vessel of 512
all original bills of lading issued for the Cargo appropriately endorsed for such delivery and/or at a discharge port or site other than 513
one specifically named in said bills of lading. 514
In consideration of such delivery, the undersigned hereby gives an indemnity containing the terms and conditions set forth in 515
Clause 27(f) of the Charter ('Indemnity Terms And Conditions'). The Indemnity Terms And Conditions are deemed incorporated in 516
and made a part of this document. The term 'Indemnifier' in the Indemnity Terms And Conditions shall be deemed to refer to the 517
undersigned.  The term 'Cargo' and the phrase 'Requested Delivery' in the Indemnity Terms And Conditions shall be deemed to, 518
respectively, mean the Cargo and the delivery request set forth in the preceding paragraph of this document. The term 'Ship' as 519
used in the Indemnity Terms And Conditions shall be deemed to refer to the Vessel.  Print the following information: 520
                                                                                                                                                                    521
                                                                                                                                                                    522
                                                                                                                                                                    523

June 1, 2000 · This electronic version is for reference only

| | | |
|---|---|---|
| Name of Charterer | _____ | 524 |
| | | 525 |
| Name of Person Acting on Behalf of Charterer | _____ | 526 |
| | | 527 |
| Authority/Title of Above Person | _____ | 528 |
| | | 529 |
| Date Indemnity Given | _____ " | 530 |
| | | 531 |

(f) Indemnity Terms and Conditions. 532

"1.  Indemnifier shall indemnify and hold harmless the Owner of the Ship, any chartered Owner of the Ship, the Ship operator, the 533
Ship Master, the Ship underwriters and the Ship agents (hereinafter jointly and individually called "Indemnitees") in respect of any 534
liability, loss, damage, costs (including, but not limited, to Attorney/Client costs) and other expense of whatever nature which the 535
Indemnitees may sustain or incur by reason of the Requested Delivery. 536

2.  In the event of any legal action or proceedings being commenced against the Indemnitees in connection with the Requested 537
Delivery, Indemnifier shall provide Indemnitees from time to time, on the Indemnitees' demand, with sufficient funds to defend 538
same. 539

3.  If the Ship or any other vessel or other property belonging to the Indemnitees should be arrested or detained or if the arrest 540
or detention thereof should be threatened for any claim in connection with the Requested Delivery, the Indemnifier shall provide, 541
upon demand of the Indemnitees, such bail or other security as may be required to prevent such arrest(s) or detention(s) or to 542
secure the release of the Ship or such vessel or other property from arrest or detention, and shall indemnify and hold harmless 543
the Indemnitees against and from any loss, damage, costs (including but not limited to Attorney/Client costs) and other expense 544
resulting from such arrest or detention or threatened arrest or detention, whether or not same may be justified and to pay to the 545
Indemnitees, on the Indemnitees' demand, the amount of such loss, damages, costs and/or expense. 546

4.  This indemnity shall automatically become null and void, and Charterer's liability hereunder shall cease, upon presentation of 547
all original Bills of Lading duly endorsed to reflect delivery of Cargo in accordance with the Requested Delivery, or upon the 548
expiration of 36 months after completion of discharge, whichever occurs first; provided that no legal proceedings arising from 549
delivery of the Cargo in accordance with the Requested Delivery have been instituted against the Indemnitees and/or Vessel within 550
such 36-month period. Owner shall advise Charterer with reasonable dispatch in writing if any proceedings are instituted. 551

5.  The within indemnity shall be governed and construed in accordance with the internal substantive laws of the State of New York, 552
USA. The Indemnitees may, but shall not be obligated to, bring any legal action or proceeding with respect to such indemnity in the 553
Courts of the State of New York, USA or in the U.S. Federal Court situated therein and the Indemnifier unconditionally and generally 554
accepts in regard to such legal action or proceeding, for itself and its property, the jurisdiction and venue of the aforesaid courts." 555

28.      WAR. 556

(a)  No contraband of war shall be shipped, but petroleum and/or its products shall not be deemed contraband of war for the purposes 557
of this Clause. Vessel shall not, however, be required, without the consent of Owner, which shall not be unreasonably withheld, to 558
enter any port, place, or zone which is involved in a state of war, warlike operations or hostilities, civil strife or piracy, whether there 559
be a declaration of war or not, where it might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act 560
by a belligerent power (the term "power" meaning any de jure or de facto authority or any other purported governmental organization 561
maintaining naval, military or air forces). 562

(b)  For the purposes of this Clause, it shall be unreasonable for Owner to withhold consent to any voyage, route, or port or place 563
of loading or discharging if insurance against all risks defined in Paragraph (a) of this Clause is then available commercially or 564
under a government program in respect of such voyage, route or port/place of loading or discharging. If such consent is given by 565
Owner, Charterer shall pay any provable additional cost of insuring Vessel against Hull war risks over and above such costs in 566
effect on the date of this Charter in an amount equal to the insured value stipulated in its ordinary marine policy as of the date of 567
this Charter. If such insurance is not obtainable commercially or through a government program, Vessel shall not be required to 568
enter or remain at any such port, place or zone and, in such case, Charterer shall have the right to order Vessel to load or discharge, 569
as the case may be, at any other port(s) or place(s) consistent with Part I (C) and (D). 570

(c)  In the event of the existence of the conditions described in Paragraph (a) of this Clause subsequent to the date of this Charter, 571
Charterer shall, in respect of a voyage to any such port, place or zone, assume any provable additional cost of wages and insurance 572
properly incurred in connection with Master, officers and crew as a consequence of such war, warlike operations or hostilities over 573
and above such costs in effect on the date of this Charter. 574

29.      EXCEPTIONS. 575

(a)  Vessel, Master and Owner shall not, unless otherwise expressly provided in this Charter, be responsible for any loss or damage 576
to cargo arising or resulting from: any act, neglect, default or barratry of Master, pilots, mariners or other servants of Owner in the 577
navigation or management of Vessel; fire, unless caused by the personal design or neglect of Owner; collision, stranding, or peril, 578
danger or accident of the sea or other navigable waters; or from explosion, bursting of boilers, breakage of shafts, or any latent 579
defect in hull, equipment or machinery. Neither Vessel, Master or Owner, nor Charterer, shall, unless otherwise expressly provided 580
in this Charter, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from: act of 581
God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people, 582
or seizure under legal process provided bond is promptly furnished to release Vessel or cargo; strike or lockout or stoppage or 583
restraint of labor from whatever cause, either partial or general; or riot or civil commotion. 584

(b)  The exceptions stated in Paragraph (a) of this Clause shall not affect Owner's warranties and undertakings herein with respect 585
to the condition of Vessel, the obligations of Owner in respect of the loading, handling, stowage, carriage, custody, care and discharge 586
of the cargo and/or the rights or obligations of either Owner or Charterer with respect to laytime or demurrage as elsewhere provided 587
in this Charter. 588

30.      LIEN.  Owner shall have a lien on all cargoes and subfreights for all amounts due under this Charter, and Charterer shall have a 589
lien on Vessel for all monies paid in advance and not earned, and all disbursements for Owner's account, including commissions, 590
cost of insurance and expenses thereon and for any damages sustained by Charterer as a result of the breach of this Charter by 591
Owner. 592

31.      AGENTS.  Unless otherwise agreed, Charterer shall nominate Vessel's agents at all port(s) and place(s). Such agents shall be 593
appointed, instructed and paid for by Owner. Owner shall have the right, at its expense, to appoint and instruct protecting agents 594
at all port(s) and place(s). 595

32.      ASSIGNMENT / SUBLET.  Charterer shall have the option of assigning this Charter or of subletting Vessel, but in either case, 596
Charterer shall always remain responsible for the due fulfilment of this Charter in all terms and conditions. 597

June 1, 2000 - This electronic version is for reference only

33.　　**CLEAN SEAS.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　598
(a) HANDLING OF TANK WASHINGS. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such  599
Program requires compliance with latest IMO and Port State regulations. The Program prohibits discharge overboard of all oil and all  600
oily water, oily ballast or oil in any form unless in compliance with IMO and Port State local regulations or under extreme circumstances  601
whereby the safety of Vessel, cargo or life at sea would be imperiled. Owner shall ensure that Vessel's personnel comply with the  602
following:  603
　　　(i)　Subsequent to the date of this Charter and in the course of the ballast passage before presenting for loading hereunder,  604
any oily residues remaining in Vessel from its previous cargoes shall be retained on board and shall be handled according to Charterer's  605
instructions.  606
　　　(ii)　During tank washing, the tank washings shall be collected into one cargo compartment and, after maximum separation  607
of free water, such free water shall be discharged overboard to the extent permitted by applicable international regulations.  608
　　　(iii)　Thereafter, Charterer shall be notified promptly by electronic mail, telex or radio of the estimated quantity of the  609
segregated tank washings and the type and source of such washings. If Charterer requires that demulsifiers shall be used for the  610
separation of oil/water, such demulsifiers shall be obtained by Owner and paid for by Charterer. Any additional Canal dues incurred on  611
the ballast passage by reason of Vessel having tank washings on board shall be for the sole account of Owner. Owner shall ensure  612
that Master, on Vessel's arrival at the loading port(s) or place(s), does the following:  613
　　　　• arranges for the measurement of the segregated tank washings in conjunction with the cargo supplier(s);  614
　　　　• records the quantity of tank washings so measured in Vessel's ullage record;  615
　　　　• issues a Slop Certificate; and  616
　　　　• arranges that the Slop Certificate and/or Vessel's ullage record be duly signed by the cargo  617
　　　　　supplier(s) and promptly sent to Charterer.  618
The segregated tank washings and any other oily residues on board (hereinafter called "residues") shall, at Charterer's option, be  619
pumped ashore into slop facilities at the loading port(s) or place(s), commingled with the cargo to be loaded or segregated from the  620
cargo to be loaded.  621
If Charterer requires Master to discharge the residues at facilities at loading port(s) or place(s), no freight shall be payable on same but  622
the time involved in accomplishing such discharge shall count as laytime or, if Vessel is on demurrage, as time on demurrage, including,  623
but not limited to, waiting for availability of, or for berthing at, the slop receiving facility and shifting to and from such facility. Further, the  624
cost of such facilities and the ultimate disposal of the residues shall be for Charterer's sole account. If Charterer requires residues to  625
be kept separate from the cargo to be loaded, same shall, at Charterer's option, be discharged at the discharging port(s) or place(s) in  626
accordance with Charterer's instructions.  627
If Charterer requires that the cargo be loaded on top of residues or that such residues be kept separate from the cargo to be loaded,  628
in either case freight shall be payable in accordance with Clause 6 on the quantity of residues at the Overage Rate, if such rate exists,  629
or otherwise at the Base Freight Rate, up to a maximum tonnage equivalent to one percent (1.0%) of Vessel's deadweight as specified  630
in Part I (A), with the exception that, in the case of a Part Cargo Minimum, no freight shall be paid if the residues are kept separate and  631
not discharged. In no event shall Charterer hold any liability for deadfreight in connection with residues, except where the Vessel is  632
ordered to load a full cargo and is required to keep residues segregated, in which case deadfreight shall be due. Nothing in Charterer's  633
instruction shall be construed as permission to contravene any applicable laws or regulations by the discharging of oily residues.  634
(b) CLEAN BALLAST. Owner warrants that Vessel will arrive at load port(s) with clean ballast.  635
(c) ITOPF. Owner warrants that it is a Member of the International Tanker Owners Pollution Federation ("ITOPF") and that Owner will  636
retain such membership during the entire period of the services of the Vessel under this Charter.  637

34.　　**DRUG AND ALCOHOL POLICY.** Owner warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the Vessel  638
which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines For the Control of Drugs and  639
Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the  640
appropriate seafarers to be tested shall be all Vessel officers and the drug/alcohol testing and screening shall include unannounced  641
testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced testing  642
be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of  643
unannounced testing and routine medical examinations. Owner further warrants that the Policy will remain in effect during the term of  644
this Charter and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual  645
impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence.  646

35.　　**ARBITRATION.** Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the  647
City of New York, pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator  648
to be appointed by Owner, one by Charterer and one by the two so chosen. The decision of any two of the three on any point or points  649
shall be final. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the  650
arbitrators and on the other party to specify further disputes or differences under this Charter for hearing and determination. The  651
arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the  652
parties, including, but not limited to, specific performance. Awards made in pursuance to this Clause may include costs, including a  653
reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having  654
jurisdiction in the premises.  655

36.　　**WAIVER OF CLAIMS.** Any claim for freight, deadfreight, demurrage and/or charges or expenses under this Charter shall be deemed  656
waived, extinguished and absolutely barred if such claim is not received by Charterer or Owner, as the case may be, in writing with  657
supporting documentation within 90 days from the date of final discharge of the cargo on the voyage with respect to which said claim  658
arises. This Clause shall not apply with respect to claims for damage, loss or shortage of cargo.  659

37.　　**BUSINESS POLICY.** Owner agrees to comply with all laws and lawful regulations applicable to any activities carried out in the name,  660
or otherwise on behalf, of Charterer under the provisions of this Charter. Owner agrees that all financial settlements, billings and reports  661
rendered by Owner to Charterer, as provided for in this Charter, shall, in reasonable detail, accurately and fairly reflect the facts about  662
all activities and transactions handled for the account of Charterer.  663

38.　　**INTERPRETATION.** The interpretation of this Charter and the rights and obligations of the parties thereto shall be governed by the  664
laws applicable to charter parties made in the City of New York. The heading of Clauses and Paragraphs are for convenience of  665
reference only and shall not affect the interpretation of this Charter. No modification, waiver or discharge of any term of this Charter  666
shall be valid unless in writing and signed by the party to be charged therewith. Notwithstanding anything in this Charter to the contrary,  667
this Charter shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would  668
constitute a violation of, or result in a loss of economic benefit under, United States anti-boycott laws and regulations.  669

# INDEX OF CLAUSES

## PART I

(A)   VESSEL DESCRIPTION AND POSITION
(B)   LAYDAYS
(C)   LOADING RANGE(S) / PORT(S) / PLACE(S)
(D)   DISCHARGING RANGE(S) / PORT(S) / PLACE(S)
(E)   CARGO QUANTITY
(F)   CARGO DESCRIPTION
(G)   FREIGHT RATE
(H)   BILLING
(I)   LAYTIME
(J)   DEMURRAGE / DEVIATION PER DAY
(K)   SPECIAL PROVISIONS
(L)   INCORPORATED CLAUSE(S)

## PART II

1.    DEFINITIONS
2.    VESSEL
3.    CLEANING
4.    VOYAGE(S)
5.    MAXIMUM CARGO
6.    FREIGHT
7.    DEADFREIGHT
8.    DEMURRAGE / DEVIATION RATE
9.    LOADING AND DISCHARGING PORT(S) / PLACE(S)
10.   ESTIMATED TIME OF ARRIVAL (ETA)
11.   NOTICE OF READINESS
12.   CANCELLATION OF CHARTER
13.   LAYTIME / DEMURRAGE
14.   LAYTIME / DEMURRAGE CONSEQUENCES
15.   LIGHTERING / DISCHARGE AT SEA / CARGO ADVISOR
16.   LOADING / DISCHARGING PLACE
17.   CARGO MEASUREMENT
18.   PUMPING IN AND OUT
19.   BACK LOADING
20.   DUES, TAXES AND OTHER CHARGES
21.   ICE
22.   DRY CARGO
23.   QUARANTINE
24.   INSPECTION
25.   HEAT
26.   BUNKERS
27.   BILLS OF LADING
28.   WAR
29.   EXCEPTIONS
30.   LIEN
31.   AGENTS
32.   ASSIGNMENT / SUBLET
33.   CLEAN SEAS
34.   DRUG AND ALCOHOL POLICY
35.   ARBITRATION
36.   WAIVER OF CLAIMS
37.   BUSINESS POLICY
38.   INTERPRETATION

# EXHIBIT 2

Matthew Mccabe

| | |
|---|---|
| **From:** | PIONTKOWSKI Jessica <JPIONTKOWSKI@lukoil-us.com> |
| **Sent:** | 20 February 2013 22:22 |
| **To:** | PIONTKOWSKI Jessica |
| **Subject:** | FW: Recap-Fairchem Mustang/Lukoil Chopt f/C CPP Mississippi River toOptions Jan 28-30 |
| **Attachments:** | Fairchem Mustang_Q88_130026727079138757.doc |

**From:** Will Sanders [mailto:Will.Sanders@clarksons.com]
**Sent:** Thursday, January 17, 2013 5:23 PM
**To:** HYLAND Michael
**Cc:** Operations Houston; Tankers Claims Houston; Clarksons Houston Chems
**Subject:** Recap-Fairchem Mustang/Lukoil Chopt f/C CPP Mississippi River toOptions Jan 28-30

```
TO:   LUKOIL
ATTN: MIKE HYLAND

TO:   FAIRFIELD CHEMICAL
ATTN: ART ALLEN

FM:   CLARKSONS SHIPPING SERVICES USA LLC.
      WILL SANDERS

PLEASED TO RECAP THE FOLLOWING FIXTURE CONCLUDED TODAY JANUARY 17, 2013 WITH ALL
SUBJECTS LIFTED.

----------- T I T L E -----------


CHARTERER   :        LUKOIL PAN-AMERICAS LLC

OWNERS      :        EURUS MARITIME S.A., PANAMA
                     C/O FAIRFIELD JAPAN LTD, ROOM 1217, WORLD TRADE CENTRE
BUILDING,
                     4-1, HAMAMATSUCHO 2-CHOME MINATO-KU, TOKYO 105-6112, JAPAN

COMMERCIAL OPERATOR: FAIRFIELD CHEMICAL CARRIERS INC
                     21 RIVER ROAD, 2ND FLOOR WILTON, CT 06897
                     TEL: +1-203-761-1147
                     FAX: +1-203-761-1227
                     EMAIL: OPS@FAIRFIELDCHEMICAL.COM
                     WEB: WWW.FAIRFIELDCHEMICAL.COM

BROKER      :        CLARKSONS SHIPPING SERVICES USA, LLC.
                     PHONE : 713-235-7400
                     FAX   : 713-235-7449
                     EMAIL : CHEMICALS@HOUSTON.CLARKSONS.COM

CHARTERPARTYFORM : EXXONMOBILVOY 2000

CHARTERPARTY DATE : JANUARY 17, 2013

----------- V E S S E L -----------

VESSEL      : FAIRCHEM MUSTANG
IMO NUMBER: : 9287297
EX-NAME     : NOT APPLICABLE
SDWT        : 20621.45 MT
SDRAFT      : 9.947 M
```

1

```
LOA             : 145.53 M
BEAM            : 23.7 M
FLAG            : PANAMA
BUILT           : NOV 13, 2003
CLASS           : NIPPON KAIJI KYOKAI
STOPPERS        : 1 X 200 MT - HINGED BAR TYPE CHAIN STOPPER
CHAIN SIZE      : 76 MM
CUBIC 98 PCT    : 20846.821 M3 (20846.821)
SLOP 98 PCT     : 1339 M3
SEGREGATIONS    : 20
PUMPS           : 14 X 250 CU. METRES/HOUR (CENTRIFUGAL (FRAMO))
6 X 150 CU. METRES/HOUR (CENTRIFUGAL (FRAMO))
1 X 70 CU. METRES/HOUR (CENTRIFUGAL (FRAMO))
TPC/TPI         : 28.98 MT / 72.45 LT
BCM             : 79.19 M
KTM             : 37.34 M
IGS             : YES
COW             : NO
SBT/CBT         : SBT
VRS             : YES
GRT             : 11627
NRT             : 6418
PCNT            : 9783
SCNT            : 10808.48
DERRICKS        :   X  MT
CRANES          : 1 X 5 MT
COATED          : SUS 316L ,
HULL            : DOUBLE HULL
CALL SIGN       : HPOW
P AND I         : JAPAN CLUB
QUALIFIED IND:  GALLAGHER MARINE SYSTEM (GMS)
OSRO            : MARINE RESPONSE ALLIANCE LLC
COC/TVEL        : JUN 18, 2013
ISPS            : APR 07, 2014
```

NATURAL SEGREGATIONS:

VESSEL APPROVALS  : TBOOK PERFORMING VESSEL IS NOT UNACCEPTABLE TO AT LEAST 3 OUT OF
THE FOLLOWING 4 OIL MAJOR COMPANIES: BP/CHEVRON/EXXON/SHELL

```
LAST SIRE REPORT  : BY WHOM - SHELL
                    WHEN - JUNE 23, 2012
                    WHERE - BALTIMORE
```

*OWNERS TO ARRANGE LUKOIL SIRE INSPECTION AT THEIR TIME AND EXPENSE.  IF ANY MAJOR
OBSERVATIONS NOTED, SAME TO BE RECTIFIED BY OWNERS PRIOR TO THE VOYAGE.

```
(ALSO ATTACHED)
LAST CARGO        :  ETHANOL/MOLASES
2ND LAST CARGO    :  SULPHURIC ACID/ETHANOL/
3RD LAST CARGO    :  ETHANOL/METHANOL/UREA SOLULTION/SULPHURIC ACID

ITINERARY         :  ETA MISSISSIPPI RIVER JAN 21-22 FOR DISCHARGE
                     ETA LOAD READY JAN 28

                     AGW, WP, WOG

ETA LOADPORT      :  JAN 21-22 FOR DISCHARGE/LOAD READY JAN 27-28
ETA DISPORT       :  FEB 6-8 - PENDING LOAD OPS
```

---------- C A R G O ----------

```
CARGO QUANTITY    : CHARTERERS OPTION UP TO FULL CARGO EXCLUDING SLOP TANKS

CARGO GRADE(S)    : CPP UNLEADED UNDARKER 2.5 NPA
```

EXCL CASINGHEAD/LUBES/SOLVENTS/CHEMICALS

SEGREGATION        : MAX 2 GRADE(S) WITHIN VSL NATURAL SEGREGATION

SEG#1: 647.51 M3 (632.02)
SEG#2: 1208.95 M3 (1223.95)
SEG#3: 1222.83 M3 (1223.48)
SEG#4: 1795.94 M3 (1798.62)
SEG#5: 628.54 M3 (629.78)
SEG#6: 1798.77 M3 (1801.07)
SEG#7: 1176.98 M3 (1161.70)
SEG#8: 1158.96 M3 (1175.80)
SEG#9: 788.56 M3 (773.56)
SEG#10: 661.44 M3 (677.79)

*OWNERS ADVISE MAX INTAKE APPROXIMATELY 130,000 BBLS CPP EXCLUDING SLOP TANKS AS
ADVISED

HEAT               : NOT APPLICABLE

----------- D A T E S ------------

LAYDAYS COMMENCING:  JANUARY 28 -0001HRS LT, 2013
LAYDAYS CANCELLING:  JANUARY 30 -2359HRS LT, 2013

----------- G E O G R A P H I C A L ----------

LOAD RANGE         : 1SP MISSISSIPPI RIVER - NNOBIBR

DISCHARGE RANGE    : 1-2SP BUENAVENTURA, COLOMBIA
                     OR CHOPT
                     1 SAFE STS LOCATION OR ANCHORAGE BALBOA
                     OR CHOPT
                     1-2SP ATLANTIC COLOMBIA


*IF STS BALBOA ALL ARRANGEMENTS FOR STS OPERATION TO BE CONDUCTED BY CHRTRS AT THEIR
TIME AND EXPENSE ALWAYS IN ACCORDANCE WITH OCIMF SHIP-TO-SHIP TRANSFER GUIDE

*SECOND DISPORT CALL/OPTION PER INTERIM CLAUSE IF APPLICABLE


----------- F I N A N C I A L ---------------

FREIGHT RATES      : USD 590,000 LUMPSUM BASIS BUENAVENTURA 1-1
                       USD 550,000 LUMPSUM BASIS BALBOA 1-1
                       USD 425,000 LUMPSUM BASIS ATLANTIC COLOMBIA 1-1

DEMURRAGE          : 17,000 USD PDPR

LAYTIME            : 72 HRS TOTAL SHINC REV

COMMISSIONS        2.5% ADDRESS COMMISSION PAYABLE TO CHRTRS ON ALL
FREIGHT/DEADFREIGHT/DEMURRAGE
                   2.5% BROKERAGE COMMISSION PAYABLE TO CLARKSONS SHIPPING SERVICES
USA INC. ON ALL FREIGHT/DEADFREIGHT/DEMURRAGE


BALANCE TERMS PER LAST DONE INTREPID CANADA/LUKOIL CP DATED JANUARY 7, 2013 WITH
LOGICAL AMMENDMENTS IF ANY.

FREIGHT PAYMENT INSTRUCTIONS IN USD VIA T/T: TBA

---------------------------------------------------

VESSEL TO PERFORM LADEN PASSAGE AT 13.0  KNOTS WSNP

3

CHRTRS AGENTS BOTH ENDS PROVIDED COMPETITIVE

------------   T E R M S   ------------

VESSEL NOT TO TENDER NOTICE OF READINESS PRIOR TO COMMENCEMENT OF LAYDAYS UNLESS
OTHERWISE AGREED

VESSEL TO ARRIVE LOADPORT WITH CLEAN BALLAST

SLOPS, IF ANY, TO BE KEPT FULLY SEGREGATED IN SLOPTANKS FROM THE CARGO LOADED UNDER
THIS CHARTER PARTY - NO FREIGHT PAYABLE ON SLOPS

VESSEL/OWNERS MUST HAVE SUBMITTED A VALID DRUG + ALCOHOL BLANKET DECLARATION TO EXXON
COMPANY INTERNATIONAL'S FLEET SERVICE

MAXIMUM 3 (THREE) HOURS WAITING CARGO DOCUMENTS TO BE FOR OWNERS'
ACCOUNT

CHARTS AMS CLAUSE (WHEN APPLICABLE):
------------------
- NOT WITHSTANDING ANYTHING CONTAINED IN THIS CHARTERPARTY FOR THE PURPOSE OF US
CUSTOMS REGULATION (19 CFR 4.7), THE OWNER CONFIRMS THAT THEY ALREADY HAVE A SCAC AND
AN ICB IN PLACE AND WILL ASSUME THE ROLE OF CARRIER FOR THE PURPOSE OF THE AMS RULES.

THE OWNERS WILL PROVIDE ALL NECESSARY CARGO INFORMATION TO THE US-CUSTOMS, HOWEVER THE
CHARTERERS ARE OBLIGED TO PROVIDE ALL THE NECESSARY CARGO INFORMATION ENABLING OWNERS
TO SUBMIT THE CARGO DECLARATION IN A TIMELY FASHION. IN THIS REGARD, CHARTERERS
INDEMNIFY

AND HOLD THE OWNERS HARMLESS AGAINST ANY LOSS OR DAMAGE WHATSOEVER ARISING OUT OF THE
NON-COMPLIANCE BY THE CHARTERERS WITH THE OBLIGATIONS UNDER THIS CLAUSE.

FURTHERMORE OWNERS TO  INDEMNIFY THE CHARTERERS FOR LOSS AND/OR DAMAGE ARISING FROM
THE OWNER'S FAILURE TO COMPLY WITH THE REGULATION AS IT HAS BEEN OUTLINED . ANY DELAY
WHICH MAY ARISE AS A CONSEQUENCE OF FAILURE TO COMPLY TIME NOT TO COUNT AS LAYTIME OR
IF THE VSL IS ALREADY ON DEMURRAGE,AS TIME ON DEMMURAGE.

REVISED BIMCO ISPS CLAUSE (4-28-04)
------------------------------------
(A)(I) FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE FOR THE SECURITY
OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS
(ISPS CODE) IN RELATION TO THE VESSEL, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL
AND "THE COMPANY" (AS DEFINED BY THE ISPS CODE) SHALL COMPLY WITH THE REQUIREMENTS OF
THE ISPS CODE RELATING TO THE VESSEL AND "THE COMPANY". UPON REQUEST THE OWNERS SHALL
PROVIDE A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM
INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS.  THE OWNERS SHALL PROVIDE
THE CHARTERS WITH THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER
(CSO).

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR
DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE OWNERS OR
"THE COMPANY" TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR THIS CLAUSE SHALL BE
FOR THE OWNERS' ACCOUNT.

(B)(I) THE CHARTERERS SHALL PROVIDE THE CSO AND THE SHIP SECURITY OFFICER (SSO)/MASTER
WITH THEIR FULL STYLE CONTACT DETAILS AND ANY OTHER INFORMATION THE OWNERS REQUIRE TO
COMPLY WITH THE ISPS CODE.

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE,
EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO
COMPLY WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS'
ACCOUNT AND ANY DELAY CAUSED BY SUCH FAILURE SHALL BE COMPENSATED AT THE DEMURRAGE
RATE.

(C) PROVIDED THAT THE DELAY IS NOT CAUSED BY THE OWNERS' FAILURE TO COMPLY WITH THEIR OBLIGATIONS UNDER THE ISPS CODE, AND THAT THE MEASURES IMPOSED BY THE PORT FACILITY OF RELEVANT AUTHORITIES APPLIES TO ALL VESSELS IN THAT PORT AND NOT SOLELY TO THE OWNER'S VESSEL, THE FOLLOWING SHALL APPLY:

(I)  NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, THE VESSEL SHALL BE ENTITLED TO TENDER NOTICE OF READINESS EVEN IF NOT CLEARED DUE TO APPLICABLE SECURITY REGULATIONS OR MEASURES IMPOSED BY A PORT FACILITY OR ANY RELEVANT AUTHORITY UNDER THE ISPS CODE.

(II)  ANY DELAY RESULTING FROM MEASURES IMPOSED BY A PORT FACILITY OR BY ANY RELEVANT AUTHORITY UNDER THE ISPS CODE SHALL COUNT AS HALF-LAYTIME OR HALF-TIME ON DEMURRAGE IF THE VESSEL IS ON LAYTIME OR DEMURRAGE.  IF THE DELAY OCCURS BEFORE LAYTIME HAS STARTED OR AFTER LAYTIME OR TIME ON DEMURRAGE HAS CEASED TO COUNT IT SHALL BE COMPENSATED BY THE CHARTERERS AT ONE HALF THE DEMURRAGE RATE AND ALWAYS IN ACCORDANCE WITH A(II).

(D) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, ANY ADDITIONAL COSTS OR EXPENSES WHATSOEVER SOLELY ARISING OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, TUG ESCORTS, PORT SECURITY FEES OR TAXES AND INSPECTIONS, UNLESS SUCH COSTS OR EXPENSES RESULT SOLELY FROM THE OWNERS' NEGLIGENCE, SHALL BE SHARED EQUALLY BETWEEN OWNER AND CHARTERER.  ALL MEASURES REQUIRED BY THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR THE OWNERS'
ACCOUNT.

(E)  IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER PARTY'S ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY.


EXXONMOBIL VOY2000 TANKER VOYAGE CHARTER PARTY WITH FOLLOWING
ALTERATIONS:
----------------------------------------------------------------------
---

  PART 1
  ------
(A) REPLACE 'IN ALL WEATHER' BY  'ABOUT' AND REPLACE 'LADEN' BY
  'WEATHER AND SAFE NAVIGATION PERMITTED'
(I) INSERT '72 (SEVENTY TWO)'
(K) INSERT
    VSL TO BE EQUIPPED DERRICKS/CRANES AS PER VESSELS DESCRIPTION
    VSLS MANIFOLD TO BE AMIDSHIPS
    VSL TO BE EQUIPPED WITH CENTRIFUGAL PUMPS
    VSL/OWNERS TO BE ACCEPTABLE TO THE ARAB LEAGUE
(L) INSERT -IF APPLICABLE-
    LUKOIL CLAUSES
    - PRIVACY CLAUSE
    - ADHERENCE TO VOYAGE-INSTRUCTIONS CLAUSE - AFTER 'VOYAGE
      INSTRUCTIONS' ADD TWICE 'PROVIDED IN LINE WITH CHARTER
      PARTY TERMS AGREED'
    - CARGO TRANSFER CLAUSE
    - STATEMENTS OF FACTS CLAUSE
    - CASUALTY REPORT CLAUSE
    - WAITING FOR ORDERS CLAUSE
    - DOW EUROPE SHIPPING CLAUSE
    - DOW SHIPPING CLAUSE AS PER OPEN-SPEC NAPHTHA
    - INTERIM PORT CLAUSE
    - PANAMA CANAL CLAUSE
    - ADDITIVE CLAUSE
    - DISCHARGE/RELOAD/COMMINGLE CLSE
    - LOADPORT DEMURRAGE TIMEBAR CLAUSE
    - LUKOIL CP ADMINISTRATION CLAUSE
    - SECA REIMBURSEMENT CLAUSE

PART 2
-------

LINE 78-80: DELETE

LINE 81-83: DELETE

LINE 114-119: REPLACE 'IF A CHANGE TO, OR VARYING ..... ARE NEXT
           TAKEN' BY THE WORDING OF THE INTERIM PORT CLAUSE LINE 174 +
176: AMEND TO 'THREE (3)'

LINE 330-335: DELETE

LINE 349-357: DELETE

LINE 359: DELETE "DEDUCT FROM FREIGHT" AND INSERT "CLAIM FROM
           OWNERS

LINE 395-399: (DRY CARGO) DELETE

LINE 412-420: (HEAT) DELETE

LINE 492: AFTER 'OF THIS CLAUSE' INSERT 'OR SHOULD THE DISCHARGING
           PORT(S) BE DIFFERENT THAN STATED IN THE ORIGINAL BILL(S)
           OF LADING'
LINE 495: DELETE 'MEET THE REQUIREMENTS OF PARAGRAPH (E) OF THIS'
           AND INSERT 'BE AS PER OWNERS PANDI CLUB WORDING SIGNED
           BY AN AUTHORIZED OFFICER OF CHARTERERS - UNDERSTOOD NO
           BANKGUARANTEE REQUIRED'
LINE 496-531: DELETE
LINE 556-574: DELETE AND INSERT "CHEVRON WAR RISK CLAUS TO APPLY
           AS OF DATE OF FIXING.  FIRST SEVEN DAYS FOR OWNERS
           ACCOUNT
LINE 593: DELETE "UNLESS OTHERWISE AGREED....AND PLACE(S)" AND
           INSERT "CHRTRS AGENTS TO BE USED AT LOAD AND DISCHARGE
           PORT(S) PROVIDED COMPETITIVE.


PRIVACY CLAUSE
--------------
ALL DETAILS OF THE FIXTURE WILL HAVE TO BE KEPT STRICTLY PRIVATE AND CONFIDENTIAL,
UNLESS BOTH - CHARTERERS AND OWNERS - HAVE NO OBJECTION TO THE FIXTURE BEING REPORTED.


ADHERENCE TO VOYAGE INSTRUCTIONS CLAUSE
----------------------------------------
THE OWNERS SHALL BE RESPONSIBLE FOR ANY TIME, COSTS, DELAYS OR LOSS SUFFERED BY THE
CHARTERERS DUE TO FAILURE TO COMPLY FULLY WITH CHARTERERS' VOYAGE INSTRUCTIONS. THE
OWNERS SHALL BE RESPONSIBLE FOR ANY TIME, COSTS, DELAYS OR LOSS ASSOCIATED WITH VESSEL
LOADING CARGO QUANTITY IN EXCESS OF VOYAGE ORDERS.
ADDITIONALLY, THE CHARTERERS SHALL NOT BE RESPONSIBLE FOR ANY DEADFREIGHT DUE TO
OWNERS' FAILURE TO LIFT MINIMUM QUANTITIY SPEFICIED IN VOYAGE ORDERS.

IF A CONFLICT ARISES BETWEEN TERMINAL ORDERS AND CHARTERERS' VOYAGE INSTRUCTIONS, THE
MASTER SHALL STOP CARGO OPERATIONS AND CONTACT THE CHARTERERS IMMEDIATELY. THE
TERMINAL ORDERS SHALL NEVER SUPERSEDE CHARTERERS' VOYAGE INSTRUCTIONS AND ANY CONFLICT
SHALL BE RESOLVED PRIOR TO RESUMPTION OF CARGO OPERATIONS.

CARGO TRANSFER CLAUSE
---------------------
AT NO TIME DURING THE VOYAGE SHALL CARGO BE TRANSFERRED BETWEEN VESSEL'S TANKS WITHOUT
THE EXPRESS CONSENT OF THE CHARTERERS. SUCH CONSENT SHALL BE REQUESTED BY MEANS OF
WRITTEN TELEX OR RADIO COMMUNICATION, SPECIFYING LOADED AND REVISED ULLAGES AND CARGO
QUANTITIES FOR THE TANKS CONCERNED AND REASONS NECESSITATING A CARGO TRANSFER.
CHARTERERS'

CONSENT SHALL NOT BE UNREASONABLY WITHHELD AND SHALL BE PROVIDED EXPEDITIOUSLY BY WRITTEN TELEX. MASTER TO CONFIRM TO THE CHARTERERS, THAT OPERATION HAS BEEN CARRIED OUT.

IN THE EVENT TRANSFER OF CARGO IS UNAVOIDABLE FOR EMERGENCY REASONS INVOLVING RISK TO VESSEL'S STRUCTURAL INTEGRITY OR SAFETY OF LIFE OR FOR SAFE NAVIGATION, THE PRIOR CONSENT OF THE CHARTERERS SHALL NOT BE

REQUIRED. HOWEVER, THE MASTER SALL INFORM THE CHARTERERS OF ANY SUCH TRANSFER AND OF CIRCUMSTANCES, THAT NESCESSITATED IT AS SOON AS POSSIBLE THEREAFTER.

STATEMENT OF FACTS CLAUSE
--------------------------
IN ORDER TO BE CONSIDERED AN AUTHORIZED DOCUMENT, STATEMENTS OF FACTS MUST BE SIGNED BY THE MASTER OF VESSEL, VESSEL'S AGENTS, SUPPLIERS OR RECEIVERS, IF POSSIBLE. IF NOT POSSIBLE, THEN MASTER TO ISSUE A LETTER OF PROTEST TO THE DISSENTING PARTY, SUBMITTED TOGETHER WITH

OWNERS' DEMURRAGE CLAIM.

CASUALTY REPORT CLAUSE
----------------------
IN THE EVENT THAT THE VESSEL IS INVOLVED IN A COLLISION, GROUNDING, FIRE EXPLOSION, SPILLAGE OR ANY OTHER INCIDENT / ACCIDENT WHICH

CAUSES DAMAGE TO THE VESSEL OR THE PORT OR THE TERMINAL AND IS LIKELY TO AFFECT THE SHIPMENT OF THE CARGO UNDER THIS CHARTER-PARTY, A THIRD PARTY AND / OR GENERATE MEDIA ATTENTION, THEN MASTER AND

OWNERS ARE TO ADVISE CHARTERERS IMMIDIATELY.

WAITING FOR ORDERS CLAUSE
--------------------------
IF CHARTERERS REQUIRE VESSEL TO INTERRUPT HER VOYAGE AWAITING FURTHER ORDERS, SUCH DELAY TO BE FOR CHARTERERS' ACCOUNT AND SHALL COUNT AS LAYTIME OR DEMURRAGE, IF VESSEL ON DEMURRAGE.

DOW EUROPE SHIPPING CLAUSE
--------------------------
VESSEL REQUIREMENTS / NAPHTHA IMPORTS / ANTWERP BERTH 759

VESSEL TO BE EQUIPPED WITH OPERATIONAL IGS (INERT GAS SYSTEM) OR CLS (CLOSED LOADING SYSTEM WITH VAPOUR RETURN LINES FITTED TO MANIFOLD), IN GOOD WORKING ORDER.

FLANGES PRESENTED FOR CONNECTING SHORE MANIFOLD:
"IGS" 1X12" ANSI 150
"CLS" 1X12" ANSI 150 AND 1X8" ANSI 150

AIRDRAFT (HEIGHT FROM CENTRE OF MANIFOLD TO WATERLINE) TO BE AT ALL TIMES BETWEEN 5 AND 16 METRES.

DISTANCE BETWEEN SHIP'S RAIL AND MANIFOLD FLANGE TO BE AT ALL TIMES BETWEEN 2 AND 7 METRES.

PUMPING CAPACITY TO BE AS CLOSE AS POSSIBLE TO 2.000 MT/H PER ARM, NOT EXCEEDING MAX. MANIFOLD PRESSURE OF 7 BAR.

IF BALLASTING NECESSARY, VESSEL TO BE EQUIPPED WITH SBT

* FOLLOWING APPLICABLE TO ANTWERP BASF INSTALLATION  MOORING FOR DISCHARGE AT BERTH 759 TO BE "PORTSIDE".
MAX. DRAFT ON EVEN KEEL 15 METRES.
LOA MAX. 250 METRES / BEAM - NO RESTRICTION

VESSELS WITH ARRIVAL DRAFT EXCEEDING 12.20 M, MUST OBTAIN ACCEPTANCE TO PROCEED, FROM BASF ANTWERP, OR FROM SHIP'S AGENT, VIA THE HARBOUR MASTER.

DOW SHIPPING CLAUSE AS PER OPEN-SPEC NAPHTHA - AMENDED
-----------------------------------------------------

(A) VESSEL TO BE ABLE TO UNLOAD HER ENTIRE CARGO WITHIN 24 HOURS
    OR MAINTAIN A PRESSURE OF MIN 100 PSI AT SHIPS RAIL.

(B) VESSEL TO BE FULLY SUITABLE FOR TRANSPORTING NAPHTHA.

(C) VESSEL TO RADIO 72/48/24 HOURS NOTICES THROUGH AGENTS TO
    RECEIVERS, IF KNOWN.

(D) VESSEL MUST OPERATE A CLOSED LOADING SYSTEM AT ALL TIMES AS
    DEFINED BELOW:
    CLOSED LOADING REFERS TO THE PROCEDURES WHEREBY TANKERS CON-
    DUCT ALL CARGO OPERATIONS, WHETHER LOADING, DISCHARGING OR
    BALLASTING, WITH TANK APERTURES CLOSED AND WITH VAPOUR BEING
    EMITTED ONLY BY MEANS OF THE DEDICATED VENTING SYSTEM WHICH IS
    DESIGNED TO DISPERSE VAPOUR CLEAR OF  WORKING AREAS AND POS-
    SIBLE IGNITION SOURCES. ALL ULLAGE, SOUNDING AND SIGHTING
    PORTS MUST BE SECURELY CLOSED.


INTERIM PORT CLSE
-----------------
  CHARTERERS TO PAY FOR ANY INTERIM LOAD- / DISCHARGE PORT(S) AT
  COST INCLUDING ADDITIONAL STEAMING TIME FOR DEVIATION EXCEEDING
  DIRECT ROUTE FROM FIRST LOADPORT TO FURTHEST DISCHARGEPORT.
  SUCH DEVIATION TIME TOGETHER WITH TIME IN PORT SHALL COUNT AS
  LAYTIME OR DEMURRAGE, IF VESSEL IS ON DEMURRAGE, PLUS BUNKERS
  CONSUMED DURING STEAMING TIME AS PER MASTER'S TELEXED STATEMENT
  PLUS PORT EXPENSES AS PER AGENT'S TELEXED DISBURSEMENT ACCOUNT.
  TIME USED FOR DEVIATION, BUNKERS SO CONSUMED AND PORT EXPENSES
  SHALL BE PAID TOGETHER WITH FREIGHT AGAINST OWNERS TELEXED IN-
  VOICE. OWNERS LATER TO SUPPLY HARDCOPY DOCUMENTS.

PANAMA CANAL CLAUSE
-------------------
ANY WAITING TIME FOR TRANSITING PANAMA CANAL IN LADEN CONDITION IN EXCESS OF 24 HOURS
IS FOR CHARTERERS ACCOUNT. WAITING TIME SHALL BE CALCULATED ON THE BASIS OF THE
DEMURRAGE RATE AND PAID TOGETHER WITH FREIGHT.

PRE-BOOKING FEE, IF IT IS REQUIRED, TO BE SPLIT TO CHARTERERS AND OWNERS AND PAID
TOGETHER WITH FREIGHT


ADDITIVE CLAUSE
---------------
IF VESSEL TO STOP TO TAKE ON ADDITIVES INCLUDING DYE, SAME NEVER TO BE HARMFULL TO
VESSELS TANKS/COATINGS/LINES OR PUMPS, IN LINE WITH CHRTRS VOYAGE INSTRUCTIONS. ALL
TIME LOST DUE TO THIS ACTION TO BE CALCULATED AT DEMURRAGE RATE PDPR AND TO BE SETTLED
TOGETHER WITH THE FREIGHT. ALL COSTS, INCL. BUT NOT LIMITED TO BUNKERS FOR EXTRA
STEAMING, TO BE FOR CHRTRS ACCOUNT AND TO BE SETTLED TOGETHER WITH THE FREIGHT
ACCORDING TO MASTERS TELEXED STATEMENT, WHICH LATER TO BE SUPPORTED BY HARD COPY
DOCUMENTS. THIS OPERATION TO BE SOLELY AT CHRTRS RISK AND OWNS TO BE SUPPLIED WITH AN
LOI ACCDG TO OWNS PANDI CLUB WORDING FOR THE ADDITIVATION OF THE CGO.

IF AN AGENCY IS REQUIRED, CHRTRS TO APPOINT THEIR AGENT AND TO SETTLE ALL EXPENSES IN
CONNECTION WITH THIS DIRECTLY WITH THE AGENT.

DISCHARGE/RELOAD/COMMINGLE CLSE
-------------------------------
CHARTERERS', AT THEIR SOLE RISK AND RESPONSIBILITY, HAS THE OPTION TO PERFORM
DISCHARGE/RELOAD PART/FULL CARGO AND/OR COMINGLING AND/OR BLENDING OPERATION(S) ON

8

BOARD VESSEL, DURING LOADING WITHIN AGREED RANGES TECHNICAL LIMITATION AGREED, OR ENROUTE TO DISCHARGE PORT(S).

TIME USED FOR SUCH OPERATION(S) INCLUDING CLEANING IF ANY, TO COUNT AS USED LAYTIME OR DEMURRAGE, IF VESSEL ON DEMURRAGE. CHARTERERS TO ISSUE LETTER OF INDEMNITY ACCORDINGLY AS PER OWNERS' LOI WORDINGS SIGNED BY AUTHORIZED OFFICER FROM CHARTERERS. ANY EXTRA EXPENSES INCURRED DUE TO ABOVE OPERATIONS TO BE FOR CHARTERERS ACCOUNT AND TO BE PAID TOGETHER WITH FREIGHT.

UNDER WS VOYAGE, SUCH OPERATION TO BE COUNTED AS AN ADDITIONAL DISCHARGE PORT FOR FREIGHT CALCULATION PURPOSES BASIS CONTRACTUAL MINIMUM QUANTITY OR HIGHEST BILLS OF LADING QUANTITY ON ANY ONE TIME DURING THE VOYAGE, WHICHEVER IS GREATER, UNDER LUMPSUM VOYAGES, SUCH OPERATION TO BE PAID AS PER INTERIM PORT CLAUSE.


LOADPORT DEMURRAGE CLAIMS TIME-BAR CLAUSE
---------------------------------------------
CHARTERERS SHALL BE DISCHARGED AND RELEASED FROM ALL LIABILITY IN RESPECT OF ANY DEMURRAGE INCURRED IN THE LOADPORT (WHICH OWNERS MAY CLAIM UNDER THIS CHARTER) UNLESS A PROVISIONAL CLAIM (FOR TIME USED IN
LOADPORT) IN WRITING HAS BEEN PRESENTED TO CHARTERERS AT CHARTERERS'
OFFICE TOGETHER WITH ALL RELEVANT DOCUMENTATION AVAILABLE FOR THE LOADPORT, WITHIN EIGHTY (80) DAYS AFTER COMPLETION OF LOADING THE CARGO UNDER THIS CHARTER PARTY.

THIS CLAUSE ONLY APPLIES FOR DEMURRAGE CLAIMS INCURRED AT LOADPORT, MEANING THAT THE GENERAL DEMURRAGE TIME-BAR OF NINETY (90) DAYS AFTER COMPLETION OF DISCHARGE IS STILL VALID.


LUKOIL CP ADMINISTRATION CLAUSE
====================================
CHARTER PARTY TERMS AND CONDITIONS ARE EVIDENCED BY THE FIXING CONFIRMATION (THE "RECAP") FORWARDED BY THE BROKER TO THE CHARTERER AND THE OWNER AFTER THAT ALL SUBJECTS HAVE BEEN LIFTED.
THE CHARTERER AND THE OWNER HEREWITH AGREE THAT THEY HAVE STUDIED ALL TERMS AND CONDITIONS DURING THE TIME THE VESSEL HAS BEEN ON SUBJECT, AND HEREBY EACH PARTY CONFIRMS ITS APPROVAL OF THE ABOVE MENTIONED FINAL FIXING CONFIRMATION (THE "RECAP").

EXCEPT IF REQUESTED IN WRITING BY EITHER PARTY, THERE WILL NOT BE ISSUED ANY FORMAL WRITTEN CHARTER PARTY


SECA REIMBURSEMENT CLAUSE
===========================
IN REF TO WORLDSCALE FIXED RATE DIFFERENTIAL NO 1 (PAGE D-1), DISTANCE TO BE USED FOR THIS CALCULATION TO BE:
A) IF ALL PORTS WITHIN SECA, DISTANCE AS PER BP DISTANCE TABLE FROM 1ST LOADPORT TO LAST DISPORT. PROVIDED ALL PORTS WITHIN SECA OR
B) IF ALL PORTS NOT WITHIN SECA, ACTUAL STEAMED DISTANCE WITHIN SECA AREA, ON LADEN LEG ONLY, AS PER A TO B VIA C WEB-BASED MILEAGE CALCULATION SYSTEM

END RECAP

PLEASE CONFIRM PROMPTLY THAT ABOVE IS IN ACCORDANCE WITH YOUR NOTES.

MANY THANKS FOR YOUR SUPPORT.

BEST REGARDS,

WILL SANDERS
CLARKSONS SHIPPING SERVICES USA LLC.
1333 WEST LOOP SOUTH
SUITE 1525
HOUSTON, TEXAS 77027
713.235.7400 OFFICE
281.919.3614 MOBILE
CHEMICALS@HOUSTON.CLARKSONS.COM

WILL.SANDERS@CLARKSONS.COM
YAHOO ID:   WSANDERS0

This email (including any attachments) is confidential and may also be privileged. It is intended solely for the use of the named addressee(s). If you are not the intended recipient, you may not copy, forward, disclose or otherwise use this email or any of its attachments - please notify the sender immediatly and then delete this email and any attachments.

Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment(s) have been checked for viruses, we cannot guarantee that they are virus free and we do not accept liability for any damage sustained as a result of viruses, and you should carry out your own virus checks.

**Matthew Mccabe**

| | |
|---|---|
| From: | Will Sanders <Will.Sanders@clarksons.com> |
| Sent: | 24 February 2013 02:30 |
| To: | HYLAND Michael; PIONTKOWSKI Jessica |
| Cc: | Operations Houston; Tankers Claims   Houston; Clarksons Houston Chems |
| Subject: | Addendum#1-Fairchem Mustang/Lukoil cp dated |

TO:   LUKOIL
ATTN: MIKE HYLAND

TO:   FAIRFIELD CHEMICAL
ATTN: ART ALLEN

FM:   CLARKSONS SHIPPING SERVICES USA LLC.
      WILL SANDERS

Please note addendum #1 agreed to today February 23, 2013 to reflect Balboa, Panama port call as agreed and
discussed.

---------- T I T L E ----------


CHARTERER :     LUKOIL PAN-AMERICAS LLC

OWNERS   :     EURUS MARITIME S.A., PANAMA
               C/O FAIRFIELD JAPAN LTD, ROOM 1217, WORLD TRADE CENTRE BUILDING,
               4-1, HAMAMATSUCHO 2-CHOME MINATO-KU, TOKYO 105-6112, JAPAN

COMMERCIAL OPERATOR:   FAIRFIELD CHEMICAL CARRIERS INC
               21 RIVER ROAD, 2ND FLOOR WILTON, CT 06897
               TEL: +1-203-761-1147
               FAX: +1-203-761-1227
               EMAIL: OPS@FAIRFIELDCHEMICAL.COM
               WEB: WWW.FAIRFIELDCHEMICAL.COM

BROKER   :   CLARKSONS SHIPPING SERVICES USA, LLC.
             PHONE : 713-235-7400
             FAX   : 713-235-7449
             EMAIL : CHEMICALS@HOUSTON.CLARKSONS.COM


CHARTERPARTYFORM  : EXXONMOBILVOY 2000

CHARTERPARTY DATE : JANUARY 17, 2013
ADDENDUM # 1.     : FEBRUARY 23, 2013

---------- V E S S E L ----------


VESSEL    : FAIRCHEM MUSTANG
IMO NUMBER: : 9287297
EX-NAME   : NOT APPLICABLE
SDWT     : 20621.45 MT
SDRAFT   : 9.947 M
LOA      : 145.53 M

1

```
BEAM        : 23.7 M
FLAG        : PANAMA
BUILT       : NOV 13, 2003
CLASS       : NIPPON KAIJI KYOKAI
STOPPERS    : 1  X 200 MT - HINGED BAR TYPE CHAIN STOPPER
CHAIN SIZE  : 76 MM
CUBIC 98 PCT : 20846.821 M3 (20846.821)
SLOP 98 PCT : 1339 M3
SEGREGATIONS : 20
PUMPS       : 14 X 250 CU. METRES/HOUR (CENTRIFUGAL (FRAMO))
6 X 150 CU. METRES/HOUR (CENTRIFUGAL (FRAMO))
1 X 70 CU. METRES/HOUR (CENTRIFUGAL (FRAMO))
TPC/TPI     : 28.98 MT / 72.45 LT
BCM         : 79.19 M
KTM         : 37.34 M
IGS         : YES
COW         : NO
SBT/CBT     : SBT
VRS         : YES
GRT         : 11627
NRT         : 6418
PCNT        : 9783
SCNT        : 10808.48
DERRICKS    :  X  MT
CRANES      : 1 X 5 MT
COATED      : SUS 316L ,
HULL        : DOUBLE HULL
CALL SIGN   : HPOW
P AND I     : JAPAN CLUB
QUALIFIED IND: GALLAGHER MARINE SYSTEM (GMS)
OSRO        : MARINE RESPONSE ALLIANCE LLC
COC/TVEL    : JUN 18, 2013
ISPS        : APR 07, 2014
```

Special Provisions for Balboa:

Chrtrs to be responsible for all costs and time in Balboa with the exception of the transit from Buenaventura to arrival Balboa.

Balance terms and conditions per original cp date January 17, 2013 with logicial amendments if any.

Please confirm promptly that above is in accordance with your notes.

End Addendum #1


Best Regards,

Will Sanders
Clarksons Shipping Services USA LLC.
1333 West Loop South
Suite 1525
Houston, Texas 77027
713.235.7400 office
281.919.3614 mobile
chemicals@houston.clarksons.com

will.sanders@sarrisons.com
Yahoo ID: wsanders0

This email (including any attachments) is confidential and may also be privileged. It is intended solely for the use of the named addressee(s). If you are not the intended recipient, you may not copy, forward, disclose or otherwise use this email or any of its attachments - please notify the sender immediately and then delete this e-mail and any attachments.

Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment(s) has been checked for viruses, we cannot guarantee that they are virus-free. We do not accept liability for any damage sustained as a result of viruses and you should carry out your own virus checks.

# EXHIBIT 3

FAIRCHEM
MUSTANG

| | | | B/L No. | 1 |

## BILL OF LADING

**Shipper**
LUKOIL PAN AMERICAS, LLC
1095 AVENUE OF THE AMERICAS, 33RD FLOOR
NEW YORK, NY 10036

**Consignee**
LUKOIL PAN AMERICAS, LLC
1095 AVENUE OF THE AMERICAS, 33RD FLOOR
NEW YORK, NY 10036

**Notify address**

| Vessel | Port of loading |
|---|---|
| FAIRCHEM MUSTANG   v. 093 | ST. ROSE, LA |
| Port of discharge | Flag |
| BUENAVENTURA, COLOMBIA | PANAMA |

## FIRST ORIGINAL

| No. of tanks | Shipper's description of cargo | Quantity said to be | |
|---|---|---|---|
| | ULTRA LOW SULFUR DIESEL | 67,498.84 | BARRELS @ 60 deg. F |
| | | 2,834,951.07 | GALLONS @ 60 deg. F |
| | | 8,812.395 | LONG TONS |
| | | 8,953.817 | METRIC TONS (AIR) |
| | | 10,726.240 | CUBIC METERS |

CLEAN ON BOARD : FEBRUARY 4, 2013
FREIGHT PAYABLE AS PER CHARTER PARTY
FHC 010396F
CHARTER REFERENCE # LUK-E13-022
AES   X20130125055852
STOWAGE:    1W, 2W, 3W, 4W, 5P, 6W, 7W, 8W, 9W, 10W

THIS SHIPMENT OF WAS LOADED ON BOARD THE VESSEL AS PART OF ONE ORIGINAL LOT OF 17,007,634  METRIC TONS
WITH NO SEGREGATION AS TO PARCELS.  NEITHER THE VESSEL NOR OWNER ASSUME ANY RESPONSIBILITY FOR THE CONSEQUENCES
IF SUCH CO-MINGLING NOR THE SEPARATION THEREOF AT TIME OF DELIVERY.

ALL TERMS, CONDITIONS, LIBERTIES AND EXCEPTIONS OF THE CHARTER PARTY DATED 17-JAN-13 INCLUDING ARBITRATION CLAUSE
ARE HEREWITH INCORPORATED.

| Issued pursuant to<br>CHARTER-PARTY dated       17-Jan-13<br><br>LUKOIL PAN-AMERICAS, LLC<br>AND ALLIED CHEMICAL CARRIERS LLC<br><br>Freight payable in accordance therewith. | S H I P P E D at the Port of Loading in apparent good order and condition<br>on board the Vessel for carriage to the Port of Discharge or so near thereto<br>as she may safely get the goods specified above.  Weight, measure, quality,<br>condition, contents and value unknown.  IN WITNESS whereof the Master or<br>Agent of the said Vessel has signed the number of Bills of Lading indicated<br>below all of this tenor and date, any of which being accomplished the other<br>shall be void.<br>FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |
|---|---|
| Freight payable at<br>            AS PER C/P | Place and date of issue<br>2/4/2013           ST. ROSE, LA |
| Number of originals Bs/L<br>            3 (THREE) | Signature<br><br>MORAN GULF SHIPPING AGENCIES AS AGENTS ONLY, ON<br>WRITTEN AUTHORITY OF AND ON BEHALF OF MASTER |

B/L No.                    2

## BILL OF LADING

Shipper
LUKOIL PAN AMERICAS, LLC
1095 AVENUE OF THE AMERICAS, 33RD FLOOR
NEW YORK, NY 10036

Consignee
LUKOIL PAN AMERICAS, LLC
1095 AVENUE OF THE AMERICAS, 33RD FLOOR
NEW YORK, NY 10036

Notify address

| Vessel | Port of loading |
| FAIRCHEM MUSTANG   v.  093 | ST. ROSE, LA |

| Port of discharge | Flag |
| BUENAVENTURA, COLOMBIA | PANAMA |

## FIRST ORIGINAL

| No. of tanks | Shipper's description of cargo | | Quantity said to be |

ULTRA LOW SULFUR DIESEL

| | |
| 67,498.83 | BARRELS @ 60 deg. F |
| 2,834,951.07 | GALLONS @ 60 deg. F |
| 8,812.395 | LONG TONS |
| 8,953.817 | METRIC TONS (AIR) |
| 10,726.240 | CUBIC METERS |

CLEAN ON BOARD : FEBRUARY 4, 2013
FREIGHT PAYABLE AS PER CHARTER PARTY
FIXC 020396F
CHARTER REFERENCE # LUK-E13-022A
AES   X20130125055852
STOWAGE:      1W, 2W, 3W, 4W, 5P, 6W, 7W, 8W, 9W, 10W

THIS SHIPMENT OF WAS LOADED ON BOARD THE VESSEL AS PART OF ONE ORIGINAL LOT OF 17,907.634  METRIC TONS
WITH NO SEGREGATION AS TO PARCELS. NEITHER THE VESSEL NOR OWNER ASSUME ANY RESPONSIBILITY FOR THE CONSEQUENCES
IF SUCH CO-MINGLING NOR THE SEPARATION THEREOF AT TIME OF DELIVERY.

ALL TERMS, CONDITIONS, LIBERTIES AND EXCEPTIONS OF THE CHARTER PARTY DATED 17-JAN-13 INCLUDING ARBITRATION CLAUSE
ARE HEREWITH INCORPORATED.

| | |
| Issued pursuant to CHARTER-PARTY dated      17-Jan-13<br><br>LUKOIL PAN-AMERICAS, LLC<br>AND ALLIED CHEMICAL CARRIERS LLC<br><br>Freight payable in accordance therewith. | S H I P P E D at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.  Weight, measure, quality, condition, contents and value unknown. IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any of which being accomplished the other shall be void.<br>FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Freight payable at<br>AS PER C/P | Place and date of issue<br>2/4/2013           ST. ROSE, LA |
| Number of originals Bs/L<br>3 (THREE) | Signature<br><br>MORAN-GULF SHIPPING AGENCIES AS AGENTS ONLY, OR WRITTEN AUTHORITY OF AND ON BEHALF OF MASTER |

# EXHIBIT 4



| Charterer | LUKOIL PAN AMERICAS LLC | | |
|-----------|-------------------------|---|---|

| | | | |
|---|---|---|---|
| | | Invoice Number: | T115646 |
| | | Invoice Date: | 03/16/13 |
| | | Invoice Type: | Demurrage |
| | | Fixture Note: 2160 | C/P Date: 01/17/13 |
| | | Vessel: | Falchem Mustang |
| Broker | Clarksons Shipping Services USA | Voyage #: | # 93 |
| | | On Board Date: | 02/04/13 |
| | | Load Port: | NEW ORLEANS |
| | | Discharge Port: | BUENAVENTURA |

| Quantity | Unit | Description | Unit Price | Amount(USD) |
|----------|------|-------------|-----------|-------------|
| 27.423611 | DAYS | DEMURRAGE | 17,000.00 | 466,201.39 |
| -0.025 | % | LESS 2.5% ADDRESS COMMISSION | 466,201.39 | -11,655.03 |

PLEASE REMIT BY WIRE TRANSFER TO:
Please reference Invoice #      115646
Wells Fargo Bank, N.A.
Philadelphia, PA USA
ABA #121 000 248
SWIFT: WFBIUS6S
Allied Chemical Carriers LLC
A/C #2000 02608 7678
Chips: 0407

**ORIGINAL**

| | |
|---|---|
| Subtotal: | 454,546.36 |
| Invoice Discount: | 0.00 |
| Total: | 454,546.36 |

Payment Terms:
AS PER C/P

21 RIVER ROAD, 2ND FLOOR
WILTON, CT 06897

Phone:1.203.761.1147
Fax:1.203.761.1227